LAW OFFICES

# STILLMAN & FRIEDMAN, P.C.

425 PARK AVENUE
NEW YORK, N.Y. 10022

CHARLES A. STILLMAN
JULIAN W. FRIEDMAN
PAUL SHECHTMAN
PETER A. CHAVKIN
SCOTT M. HIMES
MARJORIE J. PEERCE
JOHN B. HARRIS
JAMES A. MITCHELL
MICHAEL J. GRUDBERG
NATHANIEL Z. MARMUR

PATIENCE ELIZABETH ATKIN
KARIN KLAPPER ORENSTEIN
DIANA J. NEHRO
CAROLYN BARTH RENZIN
MAUREEN NAKLY
LARA M. SHALOV
PEGGY M. CROSS
EDWARD J. JOYCE
MARY MARGULIS-OHNUMA
ROBIN FLICKER

TELEPHONE
(212) 223-0200
FACSIMILE
(212) 223-1942

**VIA FEDEX**

October 21, 2005

Honorable Alfred V. Covello
United States District Judge
United States District Court
450 Main Street
Hartford, CT 06103

      Re:    United States v. Canova, No. 3:01 CR 264 (AVC)

Dear Judge Covello:

      This letter is respectfully submitted on behalf of John Canova, who will be resentenced by the Court on November 10, 2005, for health care fraud related offenses.

A.    John Canova's Recent History

      At his initial sentencing on April 4, 2003, John Canova asked the Court "to allow [him] the opportunity to stay with [his] family, to be a father and a husband, and . . . to start rebuilding [his] life." Tr. 4/4/03 at 22-23. In the two-and-a-half years since the Court imposed a one-year probation term, John has done all that and more. He has shown himself to be a caring and trustworthy individual for whom the likelihood of recidivism is non-existent.[1]

---

[1]    John successfully completed probation on April 3, 2004; he paid his $1,000 fine on the day of sentencing.

00069481.DOC.1
1981.2

10/21/05 1:48 pm

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

John is employed at Miller Stuart, Inc., an aerospace electronics firm, where he has worked since February 2003.[2] He is the Director of Business Development and supervises 15 employees. In his letter to the Court, Arthur Hoffer, the President of Miller Stuart, says this of John's work ethic:

> Since the initial sentencing on April 4, 2003, John has expanded his responsibilities at Miller Stuart, Inc. During this period, John implemented new quality procedures that ... helped tighten controls over our inventory and operating expenses. John also was an integral part of Miller Stuart winning a multi-million dollar Navy contract to manufacture Radar and System Launcher processors for the Sea Sparrow missile system.... John has also started the process of diversifying the company and is currently developing commercial electronic devices as a contract manufacturer for other companies.... It is obvious in how he handles his work and trains our employees that he makes sure all the rules and regulations are strictly enforced. If the purpose of a criminal sentence is to instill a respect for the law in an individual, Your Honor has already succeeded with John Canova.

Letter of Arthur Hoffer.[3]

As the Court will recall from the initial sentencing, John has always had a fierce commitment to the welfare of those who worked for him. Our initial sentencing submission included numerous letters from Raytel employees who spoke glowingly of John's "extra effort to help employees with their problems because he felt for them in a very personal and genuine way." Letter of Christina Zompakos. Indeed, the courtroom was packed at sentencing with Raytel employees, who came to show their support. The same is true at Miller Stuart. Virginia Barton, who works there with John, writes that he "has the time and patience to explain things to

---

[2]    When John began at Miller Stuart, his salary was $35,000 a year. It has increased since then in increments, most recently in April 2005 to $100,000. At Raytel, John earned approximately $160,000 a year.

[3]    Letters from John's friends and supporters are included in Appendix A.

2

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

. . . employees so we can have a complete understanding [and] he cares about the people that work with him and if they have a problem, he listens with his heart and not just his ears." Letter of Virginia Barton.

Although John has spent considerable time rebuilding his professional life, much of the past three years has been devoted to his family. It has been a period marked by tragedy. In February 2004, John's brother James was diagnosed with ALS, a progressive neurodegenerative disease, which eventually leads to paralysis and death. As John's sister-in-law describes in her letter to the Court, John became his brother's greatest supporter:

> My husband endured great suffering, including the inability to speak and eat. John was there not only physically, but also emotionally and intellectually. [He] was tireless and relentless in the pursuit of medical research. . . . John found hope in the smallest of things to buoy my husband's spirits and give him the will to live. . . . John gave my husband some semblance of normalcy . . . when his body was failing him. Now that my husband . . . has passed on, I still can rely on John as a sounding board and for emotional support. He is one of the few people I know who truly know the meaning of "being there" for someone whatever the sacrifice.

Letter of Fran Canova; see also letter of Emma Canova ("John was with him, supporting him, bathing him, and doing whatever he could to locate new approaches to extend Jim's life"). John is now an ALS volunteer; he delivers supplies -- voice amplification devices, wheel chairs, recliners, etc. -- to ALS patients at their homes.

The tragedy of having a brother afflicted with ALS was compounded in May 2004, when John's father died of a massive heart attack. As the Court will recall, John's father -- an ex-marine and volunteer firefighter -- was his role model, and John took the sudden death hard. Again, however, he assumed a leadership role. His sister Judith describes John's actions:

3

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

> Mom has been the one who has been chronically ill for years, and
> unable to live alone. . . . [M]y brother John took the lead. It was
> decided Mom would move in with my husband and I . . . [b]ut
> there existed a major hurdle: our home was a two story home and
> Mom can not handle steps. . . . [M]y brother John and Joe gave us
> the deposit to help us get [another] home until we sold ours. When
> we moved in, John flew down to help us get settled, the same
> weekend Hurricane Fran visited. Our home we had up for sale was
> severely damaged, and there was damage to our new home. He
> worked all weekend with us getting trees off the roof, cutting them
> up, and sopping up water that came through the roof. Never once
> did he hesitate about staying longer to assist us.

Letter of Judith A. Caputo. John now flies to Florida one weekend every other month to care for

his mother.

In July 2005, John's mother-in-law was involved in a serious car accident which

resulted in a debilitating fracture to her leg. Since the injury, she has lived with John and his

wife, and he has been her constant companion. In her letter to the Court, John's wife, Carolyn,

writes:

> John stepped in to help shoulder the burden, taking off work to
> drive us to the orthopaedic specialist in those early weeks, and later
> to therapy, because she needed stronger assistance than I could
> provide alone. She was in great physical pain, and very upset at
> having had the accident . . . and he was a calming, reassuring
> influence on her. On a daily basis, I would get her out of bed, but
> since I had to catch an early train to the city, it was John who
> would make her coffee and something to eat in the morning before
> going to work so that she could take her medications. It was my
> busy season at the time . . . so it was also generally John who was
> there for her in the evening . . . Again, this is my mother we're
> talking about, not his.

Letter of Carolyn Canova; see also letter of Judith Caputo ("[h]e gets her up in the morning,

makes her breakfast, fixes her lunch . . . and is managing her rehabilitation schedule").

Through it all, John has continued to be a good husband and parent; indeed his

responsibilities have increased significantly now that Carolyn (an accountant for

4

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

PricewaterhouseCoopers) has taken on new responsibilities that require her to work in New York

City. Again Carolyn's words are telling:

> [The commute] significantly decreases the amount of time I have
> for my family. John immediately picked up the slack, and takes
> care of dinner, grocery shopping, and laundry, along with doing all
> the running around for the kids. . . . That includes drop-off and
> pick-up for baseball practices and games, Mock Trial and other
> after school activities, doctor, dentist and orthodontist
> appointments, Bat Mitzvah lessons, PSAT review courses, and
> pretty much anything that comes up. . . . [F]or now, he pretty
> much runs the household. . . . A colleague asked . . . how I can
> possibly manage any work/life balance, and I responded that I have
> a truly wonderful husband who's always there for me and the kids.

Id.

B.    Resentencing

In remanding this case for resentencing, the Court of Appeals found that "[t]he

record supports an intended loss of recoupment in the amount of $5 million, and such a loss

should have been factored into the Guidelines considered by the district court in imposing

sentence." United States v. Canova, 412 F.3d 331, 355 (2d Cir. 2005). At the same time,

however, the Court did not deem a probation sentence unreasonable. Indeed, it noted three

distinct avenues that this Court could consider to avoid imposing an incarcerative sentence:

(i) this Court could "depart from the Sentencing Guidelines [because] monetary loss . . .

overstates . . . the seriousness of the . . . fraudulent conduct," id. at 351 n.21; (ii) this Court could

"reconsider the decision [to award Mr. Canova a six-level departure for public service and good

works] in light of the higher Guidelines range dictated by [the] loss enhancement; and (iii) this

Court could "after considering the applicable Guidelines and policy statements, as well as the

other factors outlined in 18 U.S.C. § 3553(a) . . . impose a non-Guidelines sentence." Id. at 359

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

n.29. For the reasons discussed below, we respectfully submit that one or more of these approaches should be followed.

1.      Loss Overstates the Seriousness of the Offense

        In the initial Presentence Report, the Probation Office recommended consideration of a downward departure because the loss overstated the seriousness of the offense. Presentence Report, at ¶ 87. See U.S.S.G. § 2F1.1, comment (n.11); United States v. Broderson, 67 F.3d 452 (2d Cir. 1995); see also United States v. Corry, 206 F.3d 748, 751 (7th Cir. 2000)("[t]hat the loss overstates the seriousness of the offense, is to use Koon's terminology, an encouraged basis for departure), referring to Koon v. United States, 518 U.S. 81 (1996). On the unique facts of this case, such a departure is warranted.

        As the Court will recall, the evidence showed that Raytel's patients were tested telephonically by trained technicians who carefully selected two representative 7 ½ second ECG strips, one from the "demand" phase and one from the "magnet" phase. A quality assurance technician then assessed the line technicians' selections to confirm that they were the best available samples. Thereafter, a board-certified cardiologist under contract to Raytel evaluated the test to ensure that the pacemaker was functioning properly. There was no dispute that Raytel's technicians were competent and that its cardiologists were experienced practitioners of unquestioned integrity. More importantly, the evidence showed that what was not recorded in the technicians' computers -- all or a portion of the demand after magnet ("DAM") phase -- was of no clinical value.

6

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

In letters to the Court submitted for the initial sentencing, the reviewing

cardiologists -- Dr. Eric Vanderbush and Dr. Mark Stern -- confirmed the point.[4] They wrote:

> Based on our extensive expertise in cardiac pacemaker analysis, it
> is our shared professional opinion that the patient test reports as
> prepared by Raytel, and reviewed and approved by us, clearly
> provided Medicare with a full and complete evaluation of the
> patient's pacemaker functionality at the time of the test. Because
> the two representative strips are more than sufficient for us to
> determine whether the pacemaker was properly functioning
> according to its programmed settings, we believe that Medicare has
> received full medical value for each test thusly reported.

Letter of Dr. Vanderbush and Dr. Stern; see also letter of Dr. Vanderbush ("I alone have read

more than one million [Raytel] reports and no physician has ever been dissatisfied or called me

to report an error in more than 20 years of interpretation[;] [t]he accuracy of the [Raytel] report

has earned the company a reputation that is second to none").[5]

That the $5 million figure overstates the harm is all the more apparent when one

recognizes the Connecticut technicians' only shortcut was not recording the DAM phase in the

computer.  The evidence showed that the patients were still required to count out the final 30

seconds, that the DAM ECG was transmitted telephonically, and that the transmission was

captured on audio tape from which it could be reproduced if necessary.  As the government's

witness Steve Boecklin acknowledged, "the craziness of this is that [if] you did not have readable

strip for the last 30 seconds [in the computer] you just had to bring it out of the voice log."

---

[4]    Dr. Vanderbush is the Chief of Cardiology at Harlem Hospital Center in New York City
and an Assistant Clinical Professor of Medicine at Columbia University.  Dr. Stern is the
Co-Chief of Cardiology at Little Neck Community Hospital and a Clinical Instructor of
Medicine at Cornell University.

[5]    The letters from these physicians and others, which were submitted at the time of the
initial sentencing, are collected in Appendix B.

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

Tr. 560-61 ("it was there, if I had to have it"). To borrow Mr. Boecklin's word, on this record, it is simply "craz[y]" to think that John Canova committed a $5 million fraud.

We recognize, of course, that the Court of Appeals' decision focused not on the actual loss to Medicare but on Mr. Canova's intent to frustrate Medicare's efforts to recoup payment for pacemaker tests not performed according to the precise 30-30-30 standards. 412 F.3d at 352-54. Even as to that, however, a $5 million loss figure would result in a grossly distorted measure of culpability. U.S.S.G. § 2B1.1 cmt. background ("loss serves as a measure . . . of the defendant's relative culpability"). For Medicare to have come after Raytel for the full value of each test simply because Raytel's technicians were not recording the DAM phase in the computer would have been singularly unfair.[6] It would have resulted in a punitive sanction for the company and unjust enrichment for the government. If Mr. Canova's crime was trying to prevent that from occurring, his is hardly the "heartland" fraud for which the guidelines were intended.[7]

An example based on the case of <u>United States</u> v. <u>Parsons</u>, 109 F.3d 1002 (4th Cir. 1997), is instructive. There, the defendant, a government employee, submitted "partially

---

[6]    Medicare's own conduct goes far to show that a $5 million recoupment would have been disproportionate to the wrongdoing. The trial evidence showed that in every audit for the 15 years prior to January 2000, Medicare's auditors sought only the abbreviated test reports (the two 7 ½ second strips) and <u>not</u> proof that 90 seconds of ECG had been recorded. Tr. 114-16, 118-20. Moreover, as this Court observed at the initial sentencing, the record included "disturbing evidence . . . about an inquiry to Medicare representatives that Medicare itself couldn't tell from the language of its own policy that the demand after magnet phase of this so-called 30-30-30 test was required." Tr. 4/4/03 at 27. The victim's conduct is a factor a court may consider in deciding whether to depart on loss-overstates-harm grounds. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Maldonado-Montalvo</u>, 356 F.3d 65, 71 (1st Cir. 2003).

[7]    That Raytel, under threat of indictment, opted to pay the $5 million fine does not make it a fair measure of John Canova's culpability. Indeed, in <u>Broderson</u>, the fact that the company had paid full restitution was a circumstance that was found to <u>support</u> a downward departure for the individual defendant. 67 F.3d at 457-59.

8

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

fraudulent travel vouchers" -- i.e., vouchers including legitimate and non-existent expenses. When questioned by authorities, she lied to cover up her crime, which, had it been discovered, would have required her to forfeit the entire value of her claims. 28 U.S.C. § 2514. Under the reasoning of the Court of Appeals in Canova, the "loss" would be the full amount of the claims, since that is the sum the employee sought to prevent the government from recouping. But a court could clearly conclude that defendant A who submitted a $10,000 claim that contained $100 in false expenses but lied fearing a $10,000 forfeiture was less culpable than defendant B who submitted $10,000 in false expenses and lied to prevent forfeiture. Granting a downward departure to A would reflect her lesser culpability. That Mr. Canova is situated like defendant A in the hypothetical, and not defendant B, is self-evident.[8]

Simply put, this is not a typical fraud case involving phony billings or unnecessary procedures. Quite the opposite is true: Raytel performed its pacemaker testing in the very same way as the Veterans Administration, which conducts tens of thousands of transtelephonic tests annually and does not record ECG strips in the post-magnet phase.[9]  On

---

[8]    In Parsons itself, the Fourth Circuit, like this Court, did not focus on a separate "recoupment fraud" and held that only the amount fraudulently claimed should be counted as "loss" under the guidelines. Id. at 1004 ("whatever value the victim received is set off against the entire amount paid in evaluating loss"). We invoke Parsons here not for its holding but for its facts, which provide what seems a useful hypothetical.

[9]    In an interview with the government during the investigation of this case, Sylvia Kovalchik, the nurse administrator for the United States Department of Veterans Affairs, Eastern Pacemaker Center, explained the Veterans Administrations testing procedures:

> The VA's Pacemaker Center does not conduct TTM tests for 30 seconds each on the Demand, Magnet and Demand after Magnet portions of the tests. Instead, technicians at the VA's Pacemaker Center record 30 seconds of Demand, 20 seconds of Magnet and none of the Demand After Magnet portions of the test in their AMuse@ computer system. Technicians do listen to the Demand After Magnet test for about five seconds in order to determine

9

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

these facts, a decision not to depart downward would mean imposing the same punishment on

Mr. Canova as on an inveterate criminal who "performed" phony tests on phantom patients.

Because a principal purpose of the Sentencing Guidelines is to promote proportionality, a

downward departure because the loss overstates the seriousness of the offense is appropriate in

this case. United States v. Rostoff, 53 F.3d 398, 409 (1st Cir. 1998)("a supportable finding that

the loss exaggerates the reality of events is tantamount to a finding that the conventional

sentencing range exaggerates a defendant's blameworthiness and, thus, tends to invite a

corresponding departure"). [10]

2.    Public Service and Good Works

At the initial sentencing, this Court granted a six-level downward departure for

Mr. Canova's "exemplary and many times courageous [public] service." Tr. 4/4/03 at 26.  In

affirming that departure, the Court of Appeals summarized John Canova's extraordinary record:

> As a college student, he volunteered for the Marine Corps, in
> which he honorably served his country for six years, mostly in the
> active reserves.  For seven years, he also served his Long Island
> community as a volunteer firefighter, sustaining injuries in the line
> of duty three times.  On one such occasion, he risked his life by
> entering a burning building to rescue a three-year old hiding under
> a bed, but his efforts were to no avail; the child subsequently died
> in the hospital.  While performing as a volunteer firefighter,

---

whether the pacemaker's switch has returned to its normal
position.

[10]    It is not disrespectful to the jury to acknowledge that the proof of guilt in this case was far
from overwhelming.  As the Court will recall, the government's three principal witnesses --
Steve Boecklin, Ron Vincent and Glen Pelletier, all Connecticut supervisors -- gave wildly
inconsistent accounts of what had occurred.  Moreover, testimony from the government's own
witnesses, especially Linda Abruzzo (Raytel's director of computer operations), undercut the
allegation that Mr. Canova had obstructed justice by keeping Medicare from reviewing Raytel's
full disclosure reports. See Tr. 518 ("his directive was to make [Medicare] happy").  Notably, in
sentencing Mr. Canova in April, 2003, this Court found that his trial testimony was not
perjurious. Tr. 4/4/03 at 25-26.

10

LAW OFFICES
### STILLMAN & FRIEDMAN, P.C.

Canova also participated in the successful delivery of three babies
and administered cardiopulmonary resuscitation ("CPR") to
persons in distress. . . . [M]ore recent incidents demonstrated that
Canova's commitment to helping persons in distress was an
instinctive part of his character. Notably, on three occasions,
Canova acted as a Good Samaritan (1) administering CPR to an
elderly man who experienced sudden cardiac arrest at a theme
park, (2) administering CPR to a priest who suffered a heart attack
on an airport rental car bus, and (3) assisting a woman who fainted
on a public street until paramedics arrived. In each instance, other
persons on the scene were so stunned by the distressful occurrence
as to be rendered helpless. Only Canova rushed forward to address
the emergencies.

412 F.3d at 358-59.

Most importantly for present purposes, the Court of Appeals observed that this

Court might consider an even greater departure on this ground. Id. at 359, n.29. That is because

"[t]he degree of departure appropriate from one starting point will not necessarily be the same as

appropriate from a [higher] starting point." United States v. Elefant, 999 F.2d 674, 678 (2d Cir.

1993). Accordingly, we ask the Court to grant a greater departure for extraordinary good deeds

should it determine that there is now a higher starting point under the Guidelines.

3.    Non-Guideline Sentencing

In light of Booker, this Court has the authority not to sentence John Canova

within the Guidelines scheme, but to impose a non-Guidelines sentence. United States v.

Booker, 125 S. Ct. 738 (2005). The Guidelines are now advisory, not mandatory, and the

sentencing judge's task is to fashion a "reasonable sentence" after considering the Guidelines

and the factors enumerated in Section 3553(a).[11] At the initial sentencing, this Court determined

---

[11]    That section requires a court to consider:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant; [and]
> (2) the need for the sentence imposed--

11

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

that a probation sentence was just and would not deprecate the seriousness of the crime. Since then, John Canova has proven himself to be worthy of the Court's confidence. He has successfully completed his probation term, maintained gainful employment, cared for his family during a most difficult period, and continued to show concern for his community. If ever a non-Guideline sentence were appropriate, this is the case for it.

C.    Conclusion

          In the past two-and-a-half years, John Canova has conducted himself with dignity and lived an exemplary life. He lives with a deep wound, however, knowing that he bears responsibility for the failures that occurred at Raytel and that he has forever tarnished his good name. The stigma of a felony conviction weighs heavily on him.[12] This Court took the measure of this man in April 2003 and imposed a probation sentence. The passage of time, we submit, has confirmed the soundness of that judgment.

STILLMAN & FRIEDMAN, P.C.                    Respectfully submitted,
425 Park Avenue
New York, NY  10022
212 223-0200 fax: 212 223-1942
pshechtman@stillmanfriedman.com            Paul Shechtman    CT23320
mgrudberg@stillmanfriedman.com             Michael J. Grudberg    CT23165

---

          (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
          (B) to afford adequate deterrence to criminal conduct;
          (C) to protect the public from further crimes of the defendant; and
          (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

[12]     Recently, in the aftermath of Hurricane Katrina, John sought to volunteer with the Red Cross, but was denied participation when he revealed his felony conviction on the required application. See letter of Carolyn Canova ("I found him in tears recently, upon hearing the Red Cross had turned down his application").

LAW OFFICES
STILLMAN & FRIEDMAN, P.C.

PS/MJG:wr
cc:    Assistant United States Attorney Maria Kahn
       United States Probation Officer Ray Lopez

13

**Exhibit A**

Carolyn Metzger Canova
1771 Bard Lane
East Meadow, New York 11554


October 17, 2005

The Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
Hartford, Connecticut  06103

Your Honor,

It has been two and a half years since my previous correspondence beseeching you on behalf of my husband, myself and my family to allow us to stay together as a family. I cannot believe that two and a half years later we find ourselves in the same positions, and I am once again writing to you with the same passionate request. However, before I move on to the issue of John's re-sentencing, please allow me to first take this opportunity to express my sincere gratitude for the gift of keeping our family together as a result of the Court's initial sentence, and to assure you that based on every aspect of John's conduct since that time, you may have every confidence that your original decision was indeed the right one.

John has taken the gift you gave us that day, and dedicated himself to an even greater involvement with, and commitment to, our family. You may recall that I am a tax partner with PricewaterhouseCoopers LLP. I've always worked long hours, with twelve hour days not being unusual, and during peak times, my days are even longer. When I wrote to you last, I was running the Tax Practice for PricewaterhouseCoopers LLP on Long Island. Since then, I was asked to join the New York City practice, which involves an additional three hour daily commute, and significantly decreases the amount of time I have for my family. In addition to maintaining his own full-time career, John immediately picked up the slack, and takes care of dinner, grocery shopping, and laundry, along with doing all the running around for the kids now that I'm in Manhattan on a full-time basis. That includes drop-off and pick-up for baseball practices and games, Mock Trial and other after school activities, doctor, dentist and orthodontist appointments, Bat Mitzvah lessons, PSAT review courses, and pretty much anything that comes up. I'm hoping to reach a point where I can scale back a bit, but for now, he pretty much runs the household. While it's true that he doesn't necessarily do things the way I would do them, I trust his judgement, and it's very reassuring to know that the daily workings of the kids' lives are in John's capable hands. A colleague asked me earlier this month how I can possibly manage any work/life balance, and I responded that I have a truly wonderful husband who's always there for me and the kids. We're best friends, partners in life and in love, and I could never do it otherwise.

As I wrote in my original letter, John's commitment to family extends beyond his immediate family, and he continues to demonstrate what a caring individual he truly is. My mother lives in Florida, and usually spends summers with us in New York. She's not well in general, and this year, she was feeling too poorly to even muster the strength to pack and come to New York. On

July 21, 2005, I flew down to Florida in order to help her pack and put her apartment in order. I always take a cab from the airport, but just this time, my mother said that she would come and pick me up. On the way, she got into a serious car accident in which she sustained multiple injuries. I went right from the airport to the emergency room. I knew she needed daily care that I couldn't provide long distance, and I managed to pack her up and get her to New York. From the moment we got back, John stepped in to help shoulder the burden, taking off work to drive us to the orthopaedic specialist in those early weeks, and later to therapy, because she needed stronger assistance than I could provide alone. She was in great physical pain, and very upset at having had the accident and totalling her car, and he was a calming, reassuring influence on her. On a daily basis, I would get her out of bed, but since I had to catch an early train to the city, it was John who would make her coffee and something to eat in the morning before going to work so that she could take her medications. It was my busy season at the time, and I had already lost a fair amount of time, so it was also generally John who was there for her in the evening. John was the only one she would trust to help her move around the house and into the car to go to the doctor. Again, this is my mother we're talking about, not his.

Now to his family, since we corresponded last, there has been much tragedy in John's life, and as no surprise to anyone, he was not a bystander as things began to unfold.

In May of 2004, we received a call that John's father died of a sudden massive heart attack. John was in shock. His father was his hero. John quickly pulled himself together, took the situation in hand and immediately got together with his brother to make the funeral arrangements. Everyone thought his brother Joe would be the one to give the eulogy, but when he just couldn't bring himself to do it, it was John who again stepped up and gave a stirring eulogy for his father, with humor and respect for the man who was his hero in life, and inspiration always. John's concerns naturally turned to his mother's physical and emotional welfare, as his father had been the rock and nucleus of the family. John and Joe worked out a way financially for his older sister to buy a two-family home which his mother, who is handicapped, would share so that she could be taken care of, while also maintaining some independence. John and Joe are the closest of the five siblings, and it was Joe who was at my side every day of the trial.

You may recall that John's older brother, Jim, was diagnosed with ALS, and John really took the lead among his brothers in helping Jim and his wife, Fran, to deal with the physical, emotional and financial burden of this horrible, debilitating disease. Through professional contacts, he arranged for Jim to be seen several times at the Mayo clinic, but it didn't stop there. John flew out to Minnesota personally to be with Jim and Fran during the visits, including paying for the hotel stays. He did extensive online research about ALS, and the various treatments and options available. When the disease affected Jim's throat, John researched and purchased a machine for him that could translate typed messages into audible speech, so that Jimmy could "talk" again, and regain through being able to communicate with others, a degree of normalcy in his life. John flew down to Florida regularly to visit with Jim and Fran, and later accompanied them to Philadelphia for an experimental treatment program, which he and Joe paid for. Jim passed away last April. As with his father, John also gave the eulogy at Jim's funeral. He did all he could for his older brother, and I am sure that Fran has written to tell you so in her own words.

2

Thus, two proud and supportive faces that were in your courtroom the day John was originally sentenced won't be there this time around, but I know that his father, Sal, and his older brother, Jim, will be there in spirit, and so does John. If you look hard enough, I trust that you will see them there, too.

You may also see a new face there this time; that of our son, Billy, who is now 16. If you've ever been asked to deliver a eulogy for a loved one, you know how difficult that awesome responsibility is to undertake, and John has had the painful duty of having to do so twice within the same year. Still, I believe the hardest thing John has ever done is to sit Billy down and tell him that his father is a convicted felon. As expected, Billy was pretty upset and angry at the world, and it wouldn't be respectful for me to quote from his initial reaction in this letter, but like his father, he ultimately has the strength of character to rise to the occasion and be a man. As am I, Billy is that much more proud of John for having endured this terrible burden, and emerged with dignity and determination to make his life meaningful by being there for his family and through service to others. I had confided in you my deepest fears that my children would be permanently damaged should their father be taken away from them, but I was as concerned that Billy be so embittered as to negatively impact his own potential and future. As I watch him grow into a man in his own right, I see how much Billy idolizes and needs his father, an observation that became all the more vivid as I watched John deal with the difficult loss of his own father, who had been there for him for 48 years.

To someone for whom duty, honor and service are not so important, perhaps probation would hardly be considered a punishment at all. However, for John Canova, the felony convictions themselves weigh so heavily on him, that he feels the stigma of them every day of his life, and that sting will remain with him long after any official punishment ends. I found him in tears recently, upon hearing that his application to assist with hurricane relief efforts after Katrina hit, which clearly disclosed the convictions, was turned down by the Red Cross. Contrary to anything the government might assert, John is a "go by the rules" kind of guy by nature, and couldn't be any other way, so he would never have considered omitting the required disclosure. So you see, there's official punishment, and then there's the other kind of punishment that someone like John will be subject to for the rest of his life.

In closing, I hope that you can see that John has served his original sentence, and that his actions and conduct since the time it was imposed have only served to support Your Honor's faith in him as a decent person, devoted to his family and his community, and deserving of consideration to the fullest extent possible. I humbly make the same request of you that I made originally, that in your wisdom, you recall the nature of the trial and recognize the goodness of this man and how important John is to his entire family, and allow our family to stay together.

Respectfully yours,

Carolyn Metzger Canova

Emma Canova
833 Rita Circle
St. Augustine, Florida 32086

September 28, 2005

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT. 06103

Dear Judge Covello:

I am writing this letter on behalf of my son, John Canova, who was convicted of Medicare fraud and has had his case, returned to you for re-sentencing. When John was originally sentenced his father wrote a letter to you. But since then, my husband, Sal, John's father, passed away. When John found out he had to appear before you for re-sentencing he called his sister, and told her what the appellate courts decision was. She in turn informed me and explained that about writing a letter to you. I know the basics of the case, but due to the structure of our family, my husband was the one they spoke to regarding details. I was the caregiver and mother; he was their confidante, mainly because they shared so many other things. John worked with his father, was a volunteer fireman with his dad, and also served in the Marines, as did my husband.  John would always call his dad and speak about the case, and try not to burden me with the details, mainly because of my health he did not want to upset me. See I suffer from congestive heart failure, diabetes, and reduced kidney function. Since my husband's death John, speaks with his brothers and sister on many of the matters that concern the case.

I want to share with you the John Canova I know. He has always been an involved member of the family – from the caring, loving son and brother, to the uncle all the nieces and nephew love, to an absolutely fantastic husband and father. Since he was a child John has always been compassionate and sensitive towards everyone. Whenever his father or I were ill, he would stay around the house. He would usually say his friends were busy, but it became obvious to us he wanted to make sure we were okay. When my husband and I moved to Florida, we both had many surgeries, including bypasses. John would be there and then stay after we came home to make sure we were healing properly.  He is still that caregiver, now taking on much of the responsibilities my husband had in making sure the family is being taken care of.

After his dad passed away John assumed the role of his dad, as the eldest male of the family.  When my husband passed away, I moved in with my daughter, Judy, who attends my daily needs.  John and his brother Joe have assumed the other responsibilities of my care including aiding my daughter to obtain a house that would accommodate my handicaps (she had a two-story home, and I can only walk short distances with a walker).  He and his brothers also take turns flying down to Florida to give their sister a weekend off here and there so she can spend time with her husband.

When John's older brother was dying of Lou Gerigs disease John made sure he attended to anything Jim needed.  I remember my daughter telling me, when Jim went to Philadelphia to see a specialist in April, John was with him, supporting him, bathing him, and doing whatever he could to locate new approaches to extend Jim's life span.  When my daughter-in-law talked about stem cell replacement, John was the one who got on the computer and found that China would probably be ready to start that next year with ALS patients.  John said we needed to try everything we could, and if it meant getting Jim to China we would do it.  Unfortunately my son passed away in April.  My daughter-in-law still turns to John for support and guidance on matters she needs advice on.   My daughter-in-law has even made him the executor of her will, showing the trust and love all feel towards John.

I remember after John was sentenced, he was upset because he felt he had not been able to prove his innocence.  My husband told him at that time, we know who and what you are, that are all that matters.  He went on to tell him John it is over, now you have to follow what the court says, serve your probation and build a new life.  John has done that.  He obtained a new job, focused more time on his family, served his probation with no problems, and he has moved forward.

Your Honor, John has shown his productivity and commitment to leading a good life since you originally sentenced him. He has become a volunteer with the ALS foundation, and recently signed up to work with the Red Cross. I know everyday John lives with the fact that both his father and brother passed away without seeing this issue settled. I ask Your Honor to take into account all he has done, and as a parent, I ask the court not to take another loved one from me and allow John to come home to all of us.

Respectfully Yours,

Emma Canova

Mrs. Fran Canova
186 Martesia Way
Indian Harbour Beach, FL 32937
321-777-5111

The Honorable Judge Alfred Covello
c/o Mr. Michael Grudberg
Stillman & Friedman, PC
425 Park Avenue
New York, New York 10022

August 12, 2005

Re: John Canova

Dear Honorable Judge Covello:

I cannot speak for John in the workplace, I am not a co-worker, but I am his sister-in-law and can speak of him in those terms. I have known John since 1987. My husband, James Canova, who passed away in April, 2005 from ALS (Lou Gehrig's disease) was John's brother. John has always been the strong, steadfast, levelheaded family member in every family crisis. I will tell you about John's admirable behavior while facing his brother's imminent death. Throughout my husband's illness, John was there for my husband and me. My husband endured great suffering, including the inability to speak and eat. John was there not only physically, but also emotionally and intellectually. John was tireless and relentless in the pursuit of medical research. We shared a great number of conversations about the various types of research being done around the world. I called John when, I knew that emotionally, we needed support for the third and final trip to Mayo Clinic in Minnesota in December, 2004. The three of us listened to the doctors tell my husband there was no hope, but John found hope in the smallest of things to buoy my husband's spirits and give him the will to live. One of the ways John did this was to research different computers which "spoke" typed words (a voice augmentation device). He surprised Jim with one of those devices for his birthday. My husband could once again "speak" and tell me he loved me and we could have conversations across the room. John gave my husband some semblance of normalcy and sense of freedom intellectually when his body was failing him. Toward the end of my husband's life, we went to a clinic for 3 weeks in Pennsylvania. John was there every weekend helping me take care of my husband not only in a physical manner but emotionally as well. It comforted Jim and myself greatly knowing that Jim was so well loved and thought of by his brother. I know John was devastated being in New York while his brother was enduring such pain and suffering in Florida. Now, that my husband, John's brother has passed on, I still can rely on John as a sounding board and for emotional support. He is one of the few people I know who truly know the meaning of "being there" for someone whatever the sacrifice. John told Jim and myself repeatedly that Jim's illness has put all that he is going through into prospective. Please note that also during this trying time, the family had to deal with the sorrow of John's father dying suddenly in May, 2004.

John Canova is a fine, ethical, morally responsible person. He has continued to live a "normal" life during conviction and the trial that lead to it. He is raising 2 exceptionally bright children, is a loving and supportive husband and is taking care of his ailing mother in law. John has endured much suffering and adversity in the past 5 years, yet never once, did John speak bitterly about the judicial system or all the personal loses he has endured. I believe John gets much of his strength from his strong faith in God.

I cannot and will not believe that someone who has lead so many through his exemplary personal life can be thought to be the opposite in business. The John Canova I know is not one who would be a determent to society or the business world. He always strives to do "what's right".

I am aware of John Canova's conviction and that the Court of Appeals has remanded his case back to the District court for resentencing. Please look upon all that John and his family endured these last five years as serving his sentence for charges that he was never guilty of in the first place. I respectfully request that John's nightmare finally end.

Respectfully submitted,

Fran Canova

Judith A. Caputo
833 Rita Circle
St. Augustine, Florida 32086

September 5, 2005

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT. 06103

Dear Judge Covello:

I am writing this letter on behalf of John Canova, who was convicted of Medicare fraud and has had his case returned to you for re-sentencing. I wrote to you in 2003 telling of how John influenced not only my life but my children, family, friends and even strangers. John is still that person and more. John is my brother, the third of five children. He is a caring, loving, unselfish person who has made a great impact on my life and all those around him. John chose to go to trial and clear his name instead of taking a plea because he wanted to prove his innocence. As he told me he wanted to stand up and show his family and his friends that he was following what we all were taught as children, that you fight for what you know is right. Unfortunately, for whatever reasons, he was not found innocent and we now have to write this letter. This has been the most difficult thing for John, knowing that he was not able to prove his innocence to the people he loved, but he went on. He accepted the courts first sentence back in 2003, and now is facing a re-sentencing.

Now I would like to share who John Canova still is and what he has become since 2003, as much has occurred since that letter was written. Professionally, John went on in a different career and is succeeding. Personally as a father he has continued to serve as a role model for his children and is a loving parent. As a husband he still has the love, respect and support of his wife, and as a brother he has gone from the middle child to the male head of our family.

Last year my father died suddenly from a massive heart attack. My brother Jim, who was the eldest of the sons, was diagnosed with Lou Gerigs disease in January of 2004, and unable to speak clearly by this time. John took over the "head of the family role", in more ways than one. He became what my dad always was – the person you call to talk to when you need advice, are feeling blue, or just need to feel the family connection.

With my dad's untimely death, that left the situation of my mom. Mom has been the one who has been chronically ill for years, and unable to live alone. My dad always worried about something happening to him and what about Mom. All of us always said we would be there. Well, my brother John took the lead. It was decided Mom would move in with my husband and I (as I am the only daughter and Mom was comfortable with me caring for her). But there existed a major hurdle, our home was a two story home and Mom can not handle steps. John said if I was taking on this responsibility he and my other brothers would assist us in finding another home. We did find that home, but ours was up for sale, and not sold yet. My brother John and Joe gave us the deposit to help us get the home until we sold ours. When we moved in, John flew down to help us get settled, unfortunately the weekend he came was the same weekend Hurricane Fran visited. Our home we had up for sale was severely damaged, and there was damage to our new home. He worked all weekend with us getting trees off the roof, cutting them up, and soping up water that came through the roof. Never once did he hesitate about staying longer to assist us.

During the last year of my brothers' life, John was there again. When Jim could no longer talk or communicate, there was a machine that you could type into and it would speak to you. Insurance did not cover it, and with Jim now on disability he could not afford it, John ordered it and had it delivered. The joy he brought to my brother when they were able to "talk" again was outstanding. At Christmas my brother and sister-in-law were at Mayo in Minnesota, searching for a way to stop the pain my brother was in. My sister in law was fearful (knowing my brothers condition) how Jim would take the news if there was nothing they could do for him. John met them in Minnesota. When the doctors told my brother they could

not operate to alleviate the pain, John was the one who pushed my brother not to give up hope. In March, John came down again, as he knew Jim was getting worse and he wanted to spend time with him. Additionally because of how upset my mom got every time she saw Jim, it was decided one of my other brothers would fly down to Florida to make the trip with my mother and I to see Jim. In April Jim went to Philadelphia to a health clinic that was having some success in a new treatment. John was there. At this point Jim had lost over 50 lbs, and the use of the left side of his body. John was there bathing his older brother and telling him not to give up. My brother Jim loved Hooters, so John arraigned for all my brothers to be in Philadelphia, had my other sister-in-law come and spend time with Jim's wife, and they took Jim to Hooters, for what turned out to be his last visit alive with John. At the end of April we lost our brother, Jim. John again became the strong figure for all of us. He was on the first flight down, and there for the emotion support of all the family. After Jim passed away he donated the machine he had purchased to the ALS foundation. He personally went to the ALS foundation and explained how he wanted to have this machine given to someone who could not afford it. He ended up becoming an ALS volunteer for delivering items to other ALS patients.

Through all of these personal tragedies, John has been a true hero. This is a man of compassion and caring for so many people, he never hesitates one moment when he knows you are hurting or in need. My brother Jim had purchased a bottle of good wine, one that he would never let anyone open. He always said he was saving it for the day this was all over. Unfortunately Jim never got to see that day, so at his funeral his wife opened the bottle so Jim could be there to see John taste it. We share many calls and when we speak of the loneliness of the losses we have had in the past year, he still chokes up when he thinks how my Dad and brother did not get to see this issue finished.

His compassion and caring continues to grow. Recently his expression of his caring and compassion came two weeks ago when my mother-in-law passed away. John's first question to my husband is do you need me to come down to take care of Mom, or to be there for you. Again he was willing to share himself with his family. His own mother-in-law was in a serious car accident in July, while living in Florida. Unable to walk John moved her back to New York and is currently taking care of her. He gets her up in the morning makes her breakfast, fixes her lunch and places it in the refrigerator and is managing her rehabilitation schedule.

The last expression of his compassion that I would like to share is his commitment to society. While watching the aftermath of Hurricane Katrina, he felt that he needed to do something. Something more than just writing a check. He contacted the American Red Cross phone line and email line and volunteered to become a disaster worker. He felt that with his 7 years in the Marine Reserves and 10 years as a volunteer fireman, he had something to offer back to the community. As I write this letter he is waiting to hear from them.

When John found out he had to appear before you for re-sentencing he called me up, and told me what the appellate courts decision was. Even with all that he was facing the first thing he said to me is I can't travel right now, because I don't want to do anything that I wasn't allowed to do while on probation. He said he was going to contact his probation officer to report back. He did just that and was told that it was not necessary to be put back on probation conditions. My point here is this is just one more example of how clearly he thinks, and his concern for doing the right thing.

I think the best way to share whom John Canova really is, is to share the eulogies he written for my father and brother. I believe these show the kind of person John Canova is inside and out. This kind of person does not turn his character on and off in his personal or business life, it is the person he is all the time. And with this being said I ask the Your Honor to please look at who the John Canova is that we all know, when considering the re-sentencing of my brother.

Respectfully Yours,

*Judith A. Caputo*

Judith A. Caputo
enclosures

\*[Note of Counsel: We have not included the eulogies because of their length.]

**Joseph A. Canova**
**184 North Kentucky Avenue**
**North Massapequa, New York 11758**

Home: (516) 293- 6784                                          Cell: 516-316-0168
Email: jcanova@optonline.net

September 20, 2005

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT 06103

Dear Judge Covello:

I once again find myself sitting down and writing a letter to your Honor and the court in support
of my brother, John Canova. While it is disheartening that I must write this letter, I must respect
the rule of law and system of justice that we operate within.  I'm aware of the appellate court
ruling remanding my brother John's sentencing back to your court for review and re-
determination.

Throughout the trial of my brother John and for the entire time period since his September 2002
conviction, I have been at my brothers' side watching the trail and the effect that its outcome has
held for him and our family. For the better part of September 2002 I sat in your courtroom,
behind my brother, watching his trial unfold.  While I was dismayed and stunned, after hearing
the charges made against my brother, after watching the testimony given in your court, and after
hearing a verdict of guilty being passed down by the Jury on 4 of the 5 counts, I was as much
disheartened to hear of the outcome of the appellate court ruling.

Recalling the background provided in my letter of October 16, 2002, my brother John is from a
very closely family of five children.  Of the group of five my brother John and I are most
probably the closest.  We are 18 months apart in age and have spent our lives very closely tied
together.  We served proudly and honorably side-by-side in the United States Marine Corps,
following the heritage that our father first set forth.  Following our family tradition of dedicated
community service, John and I were also proud to join our other family members as volunteer
firefighters and emergency medical technicians.

Being raised by conservative and somewhat stern parents with our dad, a former United States
Marine Assistant Drill Instructor and aerospace executive and our mom, a career homemaker,
our family values were always set high and the moral expectations for our lives were set as

Letter to the Honorable Alfred V. Covello
John A. Canova Character Letter
September 20, 2005
Page -2-

stones in a path. It was always expected within our family that we were to support the best possible values of life and give back to our community as a whole. We are very proud of the values that we were taught and the benefits of the upbringing that our parents provided. Today, these are the same traits that we now seek to pass onto our own children. Our parents and upbringing taught us the value of hard work and integrity.

Thinking about the nature of our society and our way of life, I have always believed that one of the basic premises of our judicial system was to assure that a convicted individual was publicly punished for their wrong acts. If the personal and public affect that the past three years has had on my brothers' life, on that of his family and on his career are measure of punishment and retribution, than the past three years has been a stern sentence leveled against John.

It is very hard to sit and write to the court about the reasons that it should take John's community service, character, family values, and his deeds into its consideration as a part of its upcoming decision. Being extremely close to John, our family and his have always been close and continue to grow together in our daily lives. Knowing my brother as closely as I do, all the positive attributes that one would seek out in an individual are easily found in John's nature. To write of all of his attributes and try to pass along a life time of positive virtues and memories is very difficult indeed.

Knowing my brother, a dedicated family man, husband, and father and watching him working to teach his son and daughter the positive values of life is one of the many values taught to us by our father as was taught to him by our grandfather, is a true measure of his character and commitment. We are proud to have in the proverbial sense become our parents and live our lives in their footsteps. John Canova is a great father and he is my best friend. As a family we were always taught to maintain the highest ethical standard and level of honesty and that these attributes would forever show through. Our family entrust his future to your Honor and the court and we ask that his nature, history of service to our country and community, and the burdens of the past three years are weighted into the future actions affecting his life.

One of the goals that John has had over the past years was to have our father and our family see him through the conclusion of this most trying of times. In dealing with all of the hardship of these events, John and our family has also had to deal with the loss of our Dad and our eldest brother Jim. With their passing, John has forever lost the opportunity of having them see his life return to normal and the events of the past years put finally to an end.

I know that your Honor and the court must operate and deal within the constraints that have been placed out before you. The only thing that I can and do request is that the court takes all the views of John Canova and all of the positive values and virtues that he has brought to the community and his family into consideration in determining your judgment. I also know and

Letter to the Honorable Alfred V. Covello
John A. Canova Character Letter
September 20, 2005
Page -3-

recognize that I'm not supposed to speak of the law or my view of any particular fact(s) of the trial. I would not want any connotations within this letter about such events to take away from the feeling or belief in my brother, John. I do however beseech the court to view the side of John Canova that I have grown up with and to grant him all of the considerations available under the law and within your power.

I thank you and stand respectfully yours,

Joseph A. Canova

**Arthur Hoffer**
**29 Meadow Lane**
**Manhasset, New York**

August 11, 2005

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT 06103

Dear Judge Covello:

I am writing this letter on behalf of John Canova, who was convicted of Medicare fraud
and has had his case remanded to you for re-sentencing by the Second Circuit Court of
Appeals. As you may recall, I wrote on John's behalf on March 13, 2003 when he was in
front of you for his initial sentencing. At the time, I explained that I was President of
Miller Stuart, Inc, an aerospace electronics firm, and had hired John to help with my
business.

Since the initial sentencing on April 4, 2003, John has expanded his responsibilities at
Miller Stuart, Inc. During this period, John implemented new quality procedures that
allowed the company to become ISO 9001 certified and implemented Quality Control
procedures that helped tighten controls over our inventory and operating expenses.

John also was an integral part of Miller Stuart winning a multi- million dollar Navy
contract to manufacture Radar and System Launcher processors for the Sea Sparrow
missile system that is delivered to the United States Navy. John has also started the
process of diversifying the company and is currently developing commercial electronic
devices as a contract manufacturer for other companies.

During the last 28 months since the sentencing, I have watched John deal with personal
tragedies of losing his father and then his brother. I also watched the frustration of trying
to put this case behind him and start his life over again, only to see it continue. At times,
this frustration spilled into his personality, but in general, John has handled things fine.

John has become a critical part of Miller Stuart over the past few years. As I stated in my
first letter, I wanted to scale back the hours I worked, and because of my trust in John, I
have been able to do so. John has shown me the values necessary for me to trust my
company in his hands.

As your honor decides on a new sentence for John Canova, I can only state the facts that
John has basically accepted the course of events and has started his professional career
over again. It is obvious in how he handles his work and trains the employees, that he

makes sure all the rules and regulations are strictly enforced. If the purpose of a criminal sentence is to instill a respect for the law in an individual, your honor has already succeeded with John Canova. I only hope you take into consideration the positive impact John has had on people after his conviction and allow him to remain a productive member of society.

Respectfully Yours,

Arthur Hoffer
President
Miller Stuart, Inc.

*Virginia F. Barton*
*26 Chester Street*
*Lake Grove, N.Y. 11755*

October 6, 2005

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT  06103

Dear Judge Covello,

I'm writing to you regarding the re-sentencing of John Canova by the 2nd Circuit Court of Appeals. While I cannot speak to you about John before the trail, I can speak of who he is today.

I met John in February 2003 when he came to work at Miller Stuart Inc. He was hired for a position that would help the business expand its sales in the aerospace industry. When John became Director of Business Development, he spoke to me of his conviction of Medicare Fraud. Although it was not necessary for me to know anything about his private life, John felt it was important for me to know because we would be working together. He was very remorseful for what had happened and was looking at some of the good things that had come from it. He was glad that the job at Miller Stuart afforded him more time to be with his family. He had resolved to deal with what had happened and be a better person because of it.

John has helped Miller Stuart grow in several areas and has helped me to learn new things in the process. I admire his work ethics and his determination for things to be correct. He was the perfect person to implement new quality procedures and a better inventory control that the company needed to be competitive in today's market.

Even though John's position in the company is a management position, he's always willing to help in any department that needs it, whether it's putting away stock, helping with the receiving of material or even helping me in the office. He always has the time and patience to explain things to myself or other employees so we can have a complete understanding. While John is very intelligent and knowledgeable, I have never found him to be condescending.

I also enjoy working with John because he has a good sense of humor and always tries to lighten a tense situation. He cares about the people that work with him and if they have a problem, he listens with his heart and not just his ears.

Over the past two years, I've seen John dealing with the anguish caused by the continuance of this case. Unfortunately, he has also had to deal with the death of his father and brother. All these things in a short period of time might have been enough to break another man but not John. Instead, he does fundraising for ALS, the disease that took his brother life. He continues to practice his faith and volunteer at his Temple. And he's there for his entire family, whenever they need him. The work he has been doing at Miller Stuart reflects someone who cares about what they are doing and someone who is determined to have the job done correctly.

It's been a pleasure working with John because I can always rely on him to get things done correctly and on time. I enjoy his personality and the drive and determination he puts into his work. Miller Stuart Inc. has definitely benefited by having John as an employee and although everyone is replaceable, I think the company would suffer if John were no longer with us. I know I would.

Respectfully,

*Virginia F Barton*

Eugene A. Caputo
833 Rita Circle
St. Augustine, Florida 32086

September 30, 2005

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT. 06103

Dear Judge Covello:

I am writing this letter on behalf of my brother-in-law, John Canova, who was convicted of Medicare fraud and has had his case returned to you for re-sentencing. I originally wrote the first time John was sentenced in 2003, but feel it is necessary to write again. Much has occurred since my first letter, and since that time it has afforded me the opportunity to spend more time with John.

John has always shown a strong sense of respect and honesty. He is truly a family man with high regard for family values that was demonstrated many times during the last year with the passing of his father, my father-in-law, Sal Canova. John took over as the "head" of the family and has done so with much commitment. My mother-in-law has many health problems and is handicapped, thus not being able to live alone. My wife and I have taken on the task of caring for her, by moving her in our home with us. In order for this to take place my John and his brother Joseph, have seen to the financial needs of making the new living arrangements happen, by helping purchase a home that would be conducive to my mother-in-laws needs and ours.

His commitment to family goes beyond the financial aspect; he has come to Florida to assist us in some time off of the daily tasks of being caregivers. The time that stands out the most was last September, during the hurricane season. John was here and we were suppose to go away, but Hurricane Fran had different plans for us. Instead we all stayed home together that weekend, with John's returned flight being canceled. Unfortunately we had damage from the hurricane to both homes – the new one and the one we were trying to sell. John did think twice about stepping in to help clean up debris, and clean up the water that had entered through roof damage.

During conversations with John, it is never himself he is worried about, but his family – especially his wife, children and mother. He is actively involved in the daily occurrences of his children with afterschool and social activities. John has followed the probation he was given and has gone on to pursue a new career. He continues to try to advance himself and help others whenever he can, and this showed through even more in the last weeks of his brothers' life.

In addition to John loosing his father during the last year, he also lost his brother to ALS just this last April. John's mother, Emma, my mother-in-law currently suffers from congestive heart disease, kidney failure and diabetes. Her health is, at best, poor. In addition to considering John's already served probation as part of your deliberations, please also consider how the nature of his sentencing could affect Emma's health.

Respectfully Yours,

Eugene A. Caputo