10/1/05

To Whom It may Concern,

I am writing this letter on behalf of my uncle John Canova. I am aware that he is up for resentencing for the 2003 medicare conviction. Words do not do justice in describing the man my uncle is. He has always been someone I could look up to, and go to for advice. He lives his life by putting his family + friends first. He is honest, trustworthy, and hardworking. He has faced adversity and become a better person for it. I ask that you not change or add to his original sentence. He is an asset to society, and to the livelyhood of our family. My uncle is a good man, with much to offer. Thank you for your consideration in this matter.

Sincerely,

Lori A. Connor

Mrs. Donna Mills
116 Phyllis Drive
Lindenhurst, NY 11757
September 22, 2005

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT  06103

Dear Honorable Alfred V. Covello,

     I am writing in regards to John Canova. I have known John since 1999 and I have
a tremendous amount of respect for him. Over the past few years and throughout his
ordeal it has only grown.  When I worked with John at Raytel I recognized that he
always stood by very strong principles.  He has extremely strong family and people
values with a natural desire to help others in need.  I have never seen John put himself
first.  He has not wavered from that stand throughout his ordeal.  While he was defending
himself he was defending even stronger the system by which he was eventually accused
and convicted.  I know this because I witnessed it on many occasions first hand.   He still
defends the system even more than before.

     John believes if a man works hard and tries to stand by his principles that
someone will recognize it.  Of course, not everyone does.  Although he finds himself
turned away from opportunities because of his conviction he did eventually find a job and
was able to start all over again.  He accepted that he would have to start from the bottom
and he has worked very hard to succeed in his new career.  I still recognize the strong
principles and values in John I so admired from the day I met him.

     John recently described to me his desire to volunteer to help an organization
which politely turned him away.  As usual, he was not complaining about it but rather he
was defending their decision.  I know John well enough to know and feel his
disappointment.  I was disappointed for him.  While he seems to have many challenges in
his life, his desire to help others is so strong that it appears to be his sensitive spot.  He
wells up at the mention of the recent events with his sick brother, doing everything he
could to help him and his sister-in-law through a difficult time and now how he needs to
give back to everyone who helped him and his brother before he died.  He gets very
emotional about his mother and his new role in the family since his father has died.  Not
that John hasn't been the strength in his family for a long time.   He now knows that he is
the head of the family and must keep the family together and strong.

     John believes that if goodness and truth are in your heart, it is what will get you
through life, through the good times and the bad.  I have witnessed that he lives this in his

personal and professional life and is a wonderful example to all of us who know him, of what a good person and a good hard working citizen should be. I am proud to call myself a friend of John Canova and will respect, along with John, whatever decision the court makes in regards to John's sentencing.

Sincerely,

Donna Mills

The Honorable Alfred V. Covello                                September 23, 2005
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT 06095


Dear Judge Covello,

    I am writing you today to let you know what an exemplary person John Canova is.
John and I have known each other for nine years. Two of our children attended the same
school as John's and our sixteen year olds have been fast friends since the first day that
they met. I'm glad that my son, Alex, is a great friend with John's son, Billy Canova.
I'm thrilled that the kids are buddies since Billy's family exemplifies the criteria that I
hold precious for being friends. First and foremost, Billy has loving parents in John and
Carolyn. John has always been a great father to his children. You can tell that they adore
him. John always has a smile on his face and this trait has passed well to his kids. John
has a fantastic sense of humor and this too has passed well to his children. John is also a
wonderful parent, in that he has coached his children in sports, transports them
continually to their events, and shows moral support to them in all aspects of their lives.

    John and I have bowled together on Wednesday nights for the past two years. We are
starting our third season together now. John has been a fine teammate and has always
participated in all of our league functions. John is the first one to offer support for his
teammates when they are bowling poorly. John is always the first to offer money to
donate to a good cause when one of the bowlers is raising money. John was the first on
the scene to help a bowler who had collapsed with an epileptic fit while at a practice
session a few weeks ago. John took control of the situation, had someone call 911 and
attended to the patient. As you may know, John has been an EMT and a volunteer
firefighter.

    Since September 2002 many events have occurred in John's life. His dad passed away
recently. John is the natural leader in his family. When tragedy struck, John was the one
to make sure that all the funeral arrangements and the travel arrangements for the family
to get to New York. John took care of hotels, transportation and every other little detail
so that everything ran smoothly. John has taken responsibility to make sure that every
detail of his mother's life is well taken care of. Very recently, John's brother passed
away from ALS. Again, John stepped up to the plate and showed his place as the new
head of his family by making sure that all arrangements were perfect.

    John's mother-in-law is now living with John and his family. She had broken her leg
and John immediately opened his home for her to stay as long as she needs to.
Furthermore, John had his brother-in-law live with him and his family for a very long
time while his brother-in-law, Ben was out of work. John has always been an exemplary
example of a fine, caring human being.

When my youngest son had emergency lung surgery this past June, it was John who helped out my family out the most. Without question, John was there to transport my middle son wherever he needed to go. John Canova is not the typical friend who may say, "call me if you need a hand". John makes sure that he gives a helping hand without being asked to do so. He has on numerous occasions told me what he is doing to help my family out, not asked.

I know John to be a loving father and a loving husband. He demonstrates his love for his family, his extended family and his friends at all times.

Judge Covello, I strongly believe that John Canova is a gem of a person. I am asking for you to extend to him strong consideration of allowing him to remain with his family when he stands before you again for re-sentencing. The only thing I ask of you is to remember what your thoughts were the first time you decided on sentencing John. The traits you saw in John at that time have only been reinforced and strengthened over the last three years, despite all the hardships he has faced over that time.


Sincerely


Mitch Bonder

October 10, 2005

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, Connecticut 06103

Dear Judge Covello,

It has been three years since I last wrote to you regarding my cousin John Canova. Our family acknowledges your compassion during sentencing back then. Now that John's fate is back in your hands, I wanted to share some events of the last three years.

I know John Canova as a good husband, a good father and an extraordinary person. Since my last correspondence with you, John has faced not just one, but many of life's struggles.

Sixteen months ago, John's father, my Uncle Sal, died unexpectedly. It was devastating. Uncle Sal was the rock that held my extended family together after my own Dad died in 1970 when I was nine. In the 34 years since, Uncle Sal along with his family served as surrogates to me, my two brothers and our Mom.

Then, not even a year later, John's oldest brother Jim, my cousin, passed away after a lengthy fight with Lou Gehrig's disease. The manner in which our family and John in particular faced these dramatic losses goes right to John's character.

Johnny has assumed responsibility so often in his life. From his time in the U.S. Marines and as a volunteer firefighter, Johnny risked his life. All along he always knew he had role models to whom he could look up, namely his Dad and oldest Brother. Johnny took on more responsibilities, when he married and had two children. Today, he along with his wife Carolyn, is a model parent, raising 15-year old Billy and 11-year old Beth.

Gone are two of Johnny's biggest heroes; his Dad and oldest Brother. But no doubt he has taken the seeds they threw, planted them himself, and is watching them grow on his watch. Today, John Canova is the role model, the mentor that his Dad and Brother were for so long.

At my Uncle Sal's funeral, John was a beacon of strength for our entire family. In the weeks and months after Uncle Sal's sudden death, John was very involved in the care and logistics involving his Mother Emma, left behind in Florida.

In the months before his brother's death this past May, Johnny flew to the Mayo Clinic in Rochester, Minnesota this past winter. Johnny accompanied his ailing brother across the country for a miracle cure. My wife and I drove from our home in Minnesota for dinner with Johnny, Jim and Jim's wife. We did the driving, but the three of them had the grueling experience. Days of tests, doctor's appointments, hope and despair faced us all. Johnny was there for his brother, dealing with doctors, challenging conventional wisdom, and doing everything in his power to keep Jimmy alive.

When hope faded for Jim, Johnny and his family knew the best they could do was to help Jim to not suffer. John collaborated with his brothers and sister and made sure Jim had a state-of-the-art device that could assist in his communication.

Three years ago, I wrote to you, sharing family stories from the '60s. Our childhood was the Canova's version of "The Wonder Years." Weekend bar-b-ques, swimming in an above-ground pool, listening to the Mets piped in from either the radio or television.

Decades later, the family has suffered its share of heartaches....which makes a summer memory this year all the more cherished. My son Brendan, now 12, and I flew to New York for our annual family picnic.

In between our reunion and our first trip to Cooperstown, Brendan and I made our annual pilgrimage to Shea Stadium. Die hard Mets fans now living in Minnesota. We lucked out and bought the last "good seats" and were enjoying the game from the first base line. I knew Johnny and his family were Mets fans too, and I remember a chance encounter with them in 2000 at Shea during a Mets playoff game. During the game this year, my eyes were on the lookout for any sign of John and his family....and then there they were: Johnny and his two kids sitting one section over, in the same exact row. Safe to say we shared the rest of the game together (a Mets victory) and it felt like time was standing still. Johnny and I, watching baseball just as we did in 1969. Only this time, we had our own legacies sitting beside us, with talk of baseball, stories of the summer, and how excited we were for this chance encounter.

Chance encounter? Fat chance, I say. This was a full circle of our lives. Between the sorrow are so many memories of joy like this one.

In the years since I last wrote, John Canova has faced even harder adversity. It has taken a man of character and strength to endure professional and personal loss.

Once again I appreciate your time in reading this letter. I hope it serves as a small measure of defining the great things about my cousin, Johnny Canova.

Sincerely,

*Ted Canova*

Ted Canova

**Exhibit B**

Milton J. Sands Jr., M.D. FACC
Cardiovascular Disease
15 Paper Chase Drive
Farmington, CT 06032

November 20, 2002

The Honorable Alfred V. Kovello
Chief United States District Court
United States Court House
450 Main Street
Hartford, CT.

Dear Judge Kovello:

I write on behalf of Mr. John Cannova who has been convicted of "Medicare Fraud" and will be sentenced in December of this year. I find it incredible that a jury could have convicted this honest and hard-working man and ask that you, as the sentencing Judge show the insight and mercy that this travesty of justice demands. In a single sentence, based on a eight year personal and business relationship with Mr. Cannova I find it difficult to imagine that he could have acted as alleged, in an illegal or fraudulent fashion.

I am a Board Certified Cardiologist, Chief of Cardiology at the New Britain General Hospital in New Britain, Ct., Professor of Medicine at the University of Connecticut, Associate Clinical Professor of Medicine at the Yale School of Medicine and Senior Consultant of Cardiology to the Federal Aviation Administration in Washington, DC. More importantly, as a Practicing Cardiologist, I have worked with Cardiac Pacemakers for 30 years and have served as a Consulting Cardiologist and Supervising Physician for the RayTel Corporation in Connecticut for the past eight years. During those years, I worked closely with Mr. Cannova on a number of issues including review and updating RayTel's trans-telephonic pacemaker testing protocol (s), development and implementation of a trans-telephonic intracardiac defibrillator service, requiring substantial interaction with HCFA and the local Medicare carrier and planning for a new trans-telephonic anticoagulation service.

During my interactions with Mr. Cannova I found him to be a man of tremendous integrity and honor who has always acted appropriately in his dealings with patients, physicians, staff, and third-party insurance carriers. In his capacity as the Chief Operating Officer at RayTel, he showed great diligence in maintaining a quality operation and more particularly, establishing or modifying test protocols that not only

1

met the spirit and intent of the Federal Regulations, but were clinically relevant to the practicing cardiologist and their patients.

He further strove to maintain the RayTel technical staff at the highest level of competency in pacemaker technology and interpretation of their tracings. Through all of this, I thought he did a terrific job!

I find it very disturbing that a man such as this, who has always acted with honor and integrity should be standing before you waiting to hear if he will be imprisoned over a technicality in the performance of the pacemaker testing protocol which had no negative impact on patient care or positive economic benefit for Mr. Cannova or his company.

I would draw your attention to page 23 and page 24 "Pacemaker Follow-Up" of the ACC/AHA//NASPE 2002 Guidelines for Implantation of Pacemakers and Anti-Arrhythmic Devices which is attached. It states that it is important to evaluate the pacemaker not based on time, but on the documentation of certain parameters necessary to establish normal function and battery life in free running and magnet modes. Further, the length of electrocardiographic samples for storage might quite simply take only 6-9 seconds of quality carefully selected strips to demonstrate normal function of the pacemaker. Finally, the document states, that "contemporary pacemakers do not require a post-magnet tracing."

I feel that Mr. Cannova's conviction is a major injustice and ask that you consider this letter as you debate its legality and the possible sentencing it may demand.

Sincerely yours,

Milton J. Sands Jr., M.D.

MJS: dkm

Gregoratus G. ACC/AHA/NASPE 2002 Guideline Update for Implantation of Cardiac Pacemakers and Antiarrhythmia Devices. www.acc.org

2

S.J. SCHNELLER, M.D.
Columbia-Presbyterian Medical Center
161 Fort Washington Avenue
New York, N.Y. 10032
212 305-5490

November 11, 2002

The Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, Connecticut 06103

Re: John A. Canova

To The Honorable Alfred V. Covello:

I am Associate Clinical Professor of Medicine and Surgery at Columbia University. I am an academic cardiologist and practice at Columbia-Presbyterian Medical Center in New York. I have a long experience with and expertise in cardiac arrhythmias and with pacemaker therapy. I have been a physician consultant to Cardiocare in interpreting transtelephonic pacemaker electrocardiographic tracings for more than ten years. I knew Mr. John A. Canova at Cardiocare. In our interactions, I found Mr. Canova to be truthful, ethical and reliable. I am aware that Mr. Canova has been found guilty of violating a Medicare billing law. I understand that the matter involved failure to record thirty seconds of electrocardiographic tracing after the completion of pacemaker testing with and without magnet application. I am confident that every Cardiocare tracing I interpreted or received accurately reflected pacemaker function and met the standard of medical care for transtelephonic pacemaker analysis. I believe that no patient has been or could have been harmed or placed at risk by Cardiocare transtelephonic pacemaker analysis or reporting.

Respectfully,

S.J. Schneller, M.D.

*Community Cardiology, P.C.*

GEORGE J. GOLDMAN, M.D., F.A.C.C.
AARON J. GINDEA, M.D., F.A.C.C.
MARK J. STERN, M.D., F.A.C.C.
AARON FREILICH, M.D., F.A.C.C.
SIDNEY FENIG, M.D., F.A.C.C.

800 COMMUNITY DRIVE
MANHASSET, NY 11030
TELEPHONE (516) 627-6622
TELEPHONE (516) 365-4530
BILLING OFFICE (516) 627-7893
FAX (516) 627-7845

October 14th, 2002

The Honorable Alfred V. Covello
Chief, United States District Judge
United States Courthouse
450 Main Street
Hartford, Connecticut 06103

To The Honorable Alfred V. Covello,

I am writing a letter in support of John A. Canova. I am a Cardiologist who has done consulting work as an independent contractor for Raytel for more than fifteen years. Over this period of time I have interacted with John Canova on many occasions. I have never known John to cut corners or do anything dishonest or to encourage dishonest behavior in anyone else. I know John was found guilty of Medicare fraud for violating Medicare policy 50-1. My opinion as a Cardiologist is that this policy is an antiquated policy which will be changed in the very near future. This policy has not kept up with the current technology which provides very accurate tracings in a very short period of time. Convicting John of a felony for violation of this Medicare policy in my opinion is the equivalent of giving somebody a moving violation for not using hand signals when their blinker was on. The tracings that are done with the equipment at Raytel Cardiocare give the doctors and the patients a full value with shorter rhythm strips than thirty seconds because they are so accurate.

I hope you will take this information into consideration when you judge John Canova for sentencing. If I can be of any further help, feel free to call me at the above number.

Very truly yours,

Mark J. Stern, M.D., F.A.C.P., F.A.C.C.

MJS:jm

COLUMBIA UNIVERSITY
COLLEGE OF PHYSICIANS & SURGEONS
HARLEM HOSPITAL CENTER

DEPARTMENT OF MEDICINE

October 22, 2002

The Honorable Alfred V. Covello
Chief, United States District Judge
United States Courthouse
450 Main Street
Hartford, Connecticut 06103

To The Honorable Alfred V. Covello:

I am writing this letter in support of John A. Canova. I am the Chief of Cardiology at Harlem Hospital Center in New York City. I have served as a consultant to Cardiocare since 1982 and have interacted with him on multiple occasions during his time with the company. Both as a consultant and as medical director, I have known him to have the highest ethical standards in his dealings with me as a physician and his dedication to Cardiocare, which has a reputation as the premier transtelephonic pacemaker follow up company in the United States. While I am aware that John has been convicted for violating Medicare policy 50-1, I can assure you that Medicare received more than full value and no patient was ever harmed by any report that Cardiocare generated. I alone have read more than one million reports and no physician has ever been dissatisfied or called me to report an error in more than 20 years of interpretation. The accuracy of the Cardiocare report has earned the company a reputation that is second to none.

Medicare and most importantly the Medicare recipient can be assured that the reports generated were accurate and never placed any patient at risk as evidenced by Cardiocares track record.

Sincerely yours,

Eric J. Vanderbush, M.D., F.A.C.C.
Chief, Division of Cardiology

EJV:meh

506 Lenox Avenue   New York, NY  10037

COLUMBIA UNIVERSITY
COLLEGE OF PHYSICIANS & SURGEONS
HARLEM HOSPITAL CENTER

DEPARTMENT OF MEDICINE

March 25, 2003


Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT   06103

Dear Judge Covello:

We are writing this letter on behalf of John Canova, who was convicted of
Medicare Fraud in your Court on September 25, 2002.  We are American Board
of Internal Medicine (ABIM) certified cardiologists and experts in
transtelephonic pacemaker analysis (see copies of CV's attached for your
review).  We are currently retained as cardiologist overreaders for Raytel
Medical Corporation and have been performing this service for many years,
including the 13 years during which John Canova was employed at Raytel.  As
cardiologist over readers, we review on a daily basis the pacemaker test
reports that Raytel provides to the patients' primary physicians.

We have followed the legal proceedings of John Canova very carefully and
are aware that he was convicted. It is our understanding that Mr. Canova is
to be sentenced on April 4, 2003. The intention of this letter is to
address the issue of economic impact to Medicare associated with the
actions related to this case.

As pacemaker overreaders for Raytel, each of us has reviewed an average of
50,000 tests annually. Pacemaker testing is performed in order to ascertain
that the pacemakers are functioning properly inside the patient, in
accordance with the prescribed settings programmed by the patient's own
cardiologist. Raytel performed the tests and would forward daily for our
review the standardized test report format, typically consisting of a one
page (standard 8-by 11 inch paper) report on which two 6-8 second
representative electrocardiographic tracings would be presented. (See
sample attached for reference.) These strips represented portions of only
the first two recordings of what has been referred to as the 30-30-30
testing guidelines. This general format has been consistently followed by
Raytel throughout our involvement with the company, and is considered an
industry standard for all commercial testing providers like Raytel.  This
format is sufficient for any trained cardiologist to determine proper
pacemaker functionally.

The first tracing demonstrates the pacemaker in the free-running mode,
allowing the cardiologist to determine if the pacemaker was performing
appropriately upon its detection of the patient's natural heart rhythm and
the sensing capability of the device. The second tracing demonstrates the
pacemaker performance with a magnet applied over the device (this disables.

-2-

the pacemaker's sensing circuitry temporarily) allowing the physician to determine battery status and capture verification (i.e., determine if a pacemaker in1pulse appropriately causes a cardiac contraction). The third strip is not required on the standardized report in order for the cardiologist to determine proper pacemaker functionality, since it is merely a repetition of the first strip, and has no medical value given advances in pacemaker technology and design since the drafting of the Medicare Guideline in 1984.

Based on our extensive expertise in cardiac pacemaker analysis, it is our shared professional opinion that the patient test reports as prepared by Raytel, and reviewed and approved by us, clearly provided Medicare with a full and complete evaluation of the patient's pacemaker functionality at the time of the test. Because the two representative strips are more than sufficient for us to determine whether the pacemaker was properly functioning according to its programmed settings, we believe that Medicare has received full medical value for each test thusly reported.

In further support of this position, we bring the Court's attention the official position of the American College of Cardiology (ACC) and the North American Society of Pacing and Electrophysiology (NASPE). In a position paper published in September 2002, each society has established that they do not support Medicare Guideline 50-1. In fact, the societies caution that unnecessarily recording for an extended time period, such as 90 seconds of ECG, could actually put the patient at risk. The recommendation from the Cardiology societies is not to require a specified time duration, but instead to allow the provider to take sufficient recordings in order to determine pacemaker functionality. Currently fifteen states have adopted this recommendation, and have already modified the existing 30-30-30 rule under the Medicare Guidelines,or eliminated it entirely.

We respectfully ask the Court in determining Mr. Canova's sentence to consider that there is no real economic impact in this case. While we are not expert in the legal violations the jury has found, we can say that Raytel always provided complete and sound medical reports for our review, and inasmuch as Medicare received full value of the tests performed, in our professional opinion there was no financial impact to Medicare. If we may be of further assistance to provide additional clarification to the Court on these technical matters, please contact us at your convenience.

Respectfully submitted,

Eric J. Vanderbush, M.D., F.A.C.C.



## RAYTEL CARDIAC SERVICES
### A Raytel Medical Corporation Company
### 1-800-CDI-PACE(234-7223)

## TRANSTELEPHONIC
### PACEMAKER REPORT

Patient Name: ANTONIO CINTRON
Patient ID#: 161360
Report Date: 8/30/99
Clinic #:
Telephone #: (520)758-6822
Birthdate: 10/19/19
Pacer Dependent:

Pacer: C.P.I. / 1273 / PG315565
Implant Date: 6/04/99
Mode/Rate/AV Delay: DDDR / / 000
Hysteresis:
Magnet Rate: 100BPM
EOL: MAG DOO @85
Reason For Implant: Sinus Node Dysfunction

Vent Lead:
CPI / 4035 / 211840
Implant Date: 6/04/99
Atr Lead:
CPI / 4440 / BIP10583
Implant Date: 6/04/99

# SUMMARY:  PACER FUNCTION APPEARS NORMAL

MO 1400

### DEMAND



### MAGNET          RATE : 100.0/600ms    AV : 95ms



### ANALYSIS

ATRIAL SENSING IS DEMONSTRATED NORMAL.
VENTRICULAR SENSING IS NOT DEMONSTRATED.
ATRIAL CAPTURE IS NOT DEMONSTRATED.
VENTRICULAR CAPTURE IS DEMONSTRATED NORMAL.
BATTERY STATUS IS DEMONSTRATED NORMAL

| | AGE | MEASURED INTERVALS | | | | | |
| | | DEMAND | | | MAGNET | | |
| DATE | MOS | VV or AA | BPM | AV | VV or AA | BPM | AV |
|---|---|---|---|---|---|---|---|
| FIRST TEST | 1 | | | | 600 | 100 | 98 |
| 8/30/99 | 2 | | | | 600 | 100 | 95 |

DR. THOMAS  JACOBSON
1648 HIGHWAY 95
BULLHEAD CITY, AZ 86426

2

# Community Cardiology, P.C.

GEORGE J. GOLDMAN, M.D., F.A.C.C.
AARON J. GINDEA, M.D., F.A.C.C.
MARK J. STERN, M.D., F.A.C.C.
AARON FREILICH, M.D., F.A.C.C.
SIDNEY FENIG, M.D., F.A.C.C.

March 25, 2003

800 COMMUNITY DRIVE
MANHASSET, NY 11030
TELEPHONE (516) 627-6622
TELEPHONE (516) 365-4530
BILLING OFFICE (516) 627-7893
FAX (516) 627-7845

Honorable Alfred V. Covello
Chief United States District Judge
United States Courthouse
450 Main Street
Hartford, CT 06103

Dear Judge Covello:

We are writing this letter on behalf of John Canova, who was convicted of Medicare Fraud in your Court on September 25, 2002. We are American Board of Internal Medicine-certified cardiologists and experts in transtelephonic pacemaker analysis (see copies of CV's attached for your review). We are currently retained as cardiologist overreaders for Raytel Medical Corporation and have been performing this service for many years, including the 13 years during which John Canova was employed at Raytel. As cardiologist overreaders, we review on a daily basis the pacemaker test reports that Raytel provides to the patients' primary physicians.

We have followed the legal proceedings of John Canova very carefully and are aware that he was convicted. It is our understanding that Mr. Canova is to be sentenced on April 4, 2003. The intention of this letter is to address the issue of economic impact to Medicare associated with the actions related to this case.

As pacemaker overreaders for Raytel, each of us has reviewed an average of 50,000 tests annually. Pacemaker testing is performed in order to ascertain that the pacemakers are functioning properly inside the patient, in accordance with the prescribed settings programmed by the patient's own cardiologist. Raytel performed the tests and would forward daily for our review the standardized test report format, typically consisting of a one page (standard 8½ by 11 inch paper) report on which two 6-8 second representative electrocardiographic tracings would be presented. (See sample attached for reference.) These strips represented portions of only the first two recordings of what has been referred to as the 30-30-30 testing guidelines. This general format has been consistently followed by Raytel throughout our involvement with the company, and is considered an industry standard for all commercial testing providers like Raytel. This format is sufficient for any trained cardiologist to determine proper pacemaker functionality.

The first tracing demonstrates the pacemaker in the free-running mode, allowing the cardiologist to determine if the pacemaker was performing appropriately upon its detection of the patient's natural heart rhythm and the sensing capability of the device. The second tracing demonstrates the pacemaker performance with a magnet applied over the device (this disables the pacemaker's sensing circuitry temporarily) allowing the physician to determine battery status

and capture verification (i.e., determine if a pacemaker impulse appropriately causes a cardiac contraction). The third strip is not required on the standardized report in order for the cardiologist to determine proper pacemaker functionality, since it is merely a repetition of the first strip, and has no medical value given advances in pacemaker technology and design since the drafting of the Medicare Guideline in 1984.

Once satisfied as to the results, we approve and sign the reports, returning them to Raytel. They in turn forward the completed reports to the patients' primary physicians for incorporation into the patients' overall cardiac care. It should be noted that the purpose of a successful transtelephonic report is to determine only the functional relationship of the pacemaker with the patient at the time of the test. The patient's physician must then integrate the results of that test into the patient's overall care management.

Based on our extensive expertise in cardiac pacemaker analysis, it is our shared professional opinion that the patient test reports as prepared by Raytel, and reviewed and approved by us, clearly provided Medicare with a full and complete evaluation of the patient's pacemaker functionality at the time of the test. Because the two representative strips are more than sufficient for us to determine whether the pacemaker was properly functioning according to its programmed settings, we believe that Medicare has received full medical value for each test thusly reported.

In further support of this position, we bring to the Court's attention the official position of the American College of Cardiology (ACC) and the North American Society of Pacing and Electrophysiology (NASPE). In a position paper published in September 2002, each society has established that they do not support Medicare Guideline 50-1. In fact, the societies caution that unnecessarily recording for an extended time period, such as 90 seconds of ECG, could actually put the patient at risk. The recommendation from the Cardiology societies is not to require a specified time duration, but instead to allow the provider to take sufficient recordings in order to determine pacemaker functionality. Currently fifteen states have adopted this recommendation, and have already modified the existing 30-30-30 rule under the Medicare Guidelines, or eliminated it entirely.

We respectfully ask the Court in determining Mr. Canova's sentence to consider that there is no real economic impact in this case. While we are not expert in the legal violations the jury has found, we can say that Raytel always provided complete and sound medical reports for our review, and inasmuch as Medicare received full value of the tests performed, in our professional opinion there was no financial impact to Medicare. If we may be of further assistance to provide additional clarification to the Court on these technical matters, please contact us at your convenience.

Respectfully submitted,

Mark J. Stern, M.D., F.A.C.P., F.A.C.C.



# RAYTEL CARDIAC SERVICES
### A Raytel Medical Corporation Company
### 1-800-CDI-PACE(234-7223)

## TRANSTELEPHONIC
### PACEMAKER REPORT

| | | |
|---|---|---|
| Patient Name: ANTONIO CINTRON | Pacer: C.P.I. / 1273 / PG315565 | Vent Lead: |
| Patient ID#: 161360 | Implant Date: 6/04/99 | CPI / 4075 / 211840 |
| Report Date: 8/30/99 | Mode/Rate/AV Delay: DDDR / / 000 | Implant Date: 6/04/99 |
| Clinic #: | Hysteresis: | Atr Lead: |
| Telephone #: (520)758-6822 | Magnet Rate: 100BPM | CPI / 4440 / BIP10583 |
| Birthdate: 10/19/19 | EOL: MAG DOO @85 | Implant Date: 6/04/99 |
| Pacer Dependent: | Reason For Implant: Sinus Node Dysfunction | |

## SUMMARY:  PACER FUNCTION APPEARS NORMAL

MO 1400

### DEMAND



### MAGNET          RATE : 100.0/600ms     AV : 95ms



### ANALYSIS
RIAL SENSING IS DEMONSTRATED NORMAL.
NTRICULAR SENSING IS NOT DEMONSTRATED.
RIAL CAPTURE IS NOT DEMONSTRATED.
NTRICULAR CAPTURE IS DEMONSTRATED NORMAL.
TTERY STATUS IS DEMONSTRATED NORMAL

### MEASURED INTERVALS

| | AGE | DEMAND | | | MAGNET | | |
|---|---|---|---|---|---|---|---|
| DATE | MOS | VV or AA | BPM | AV | VV or AA | BPM | AV |
| FIRST TEST | 1 | | | | 600 | 100 | 98 |
| 8/30/99 | 2 | | | | 600 | 100 | 95 |

DR. THOMAS JACOBSON
1648 HIGHWAY 95
BULLHEAD CITY, AZ 86426

2639

3

2

## CURRICULUM VITAE

December 31, 2002

### PERSONAL DATA:

| | |
|---|---|
| Name: | Eric John Vanderbush, M.D., F.A.C.C. |
| Birthdate: | January 19, 1942 |
| Birthplace: | Pipestone, Minnesota |
| Citizenship: | USA |
| Office #: | 212-939-4701 |
| Fax #: | 212-939-4706 |
| E mail: | **vanderbe@nychhc.org** |

### ACADEMIC TRAINING:

| | | |
|---|---|---|
| St. Olaf College, Northfield, Minnesota | A.B. | 1964 |
| College of Physicians and Surgeons Columbia University, New York, NY | M.D. | 1968 |

### LICENSURE:

BNDD Number – BV3622544
New York State License No. 108608

### POSTGRADUATE TRAINING:

| | |
|---|---|
| Internship (Straight Medical), Harlem Hospital Center New York, NY | 1968 – 1969 |
| First Year Residency (Medical), Harlem Hospital Center New York, NY | 1972 – 1973 |
| Second Year Residency (Medical), Harlem Hospital Center New York, NY | 1973 – 1974 |
| Chief Resident (Medical), Harlem Hospital Center New York, NY | 1974 - 1975 |
| First Year Cardiology Fellow, Harlem Hospital Center New York, NY | 1975 – 1976 |
| Second Year Cardiology Fellow, Harlem Hospital Center New York, NY | 1976 – 1977 |

### BOARD CERTIFICATIONS

| | |
|---|---|
| Diplomate, American Board of Internal Medicine | June, 1975 |
| Diplomate, Cardiovascular Disease,   American Board of Internal Medicine | November, 1981 |

Eric J. Vanderbush, M.D., F.A.C.C.
Curriculum Vitae
Page Two

## GOVERNMENTAL SERVICE

| | |
|---|---|
| SA Surgeon, UPHS, Indian Division, Belcourt, N.D. | 1969 – 1970 |
| Surgeon, USPHS, Indian Division, Belcourt, N.D. | 1970 – 1971 |

## MEDICAL SOCIETIES – MEMBERSHIPS

New York Heart Association
American Heart Association
Member, Board of Directors, New York County
  Health Services Organization, New York            1984 - Present
American College of Cardiology

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| Instructor in Clinical Medicine, College of Physicians and Surgeons, Columbia University, New York, NY | 1977 – 1987 |
| Assistant clinical Professor of Medicine, College of Physicians and Surgeons, Columbia University, New York, NY | 1987 – Present |

## HOSPITAL APPOINTMENTS

| | |
|---|---|
| Assistant Visiting Physician, Lincoln Hospital Bronx, New York | 1971 – 1972 |
| Clinical Assistant Attending Physician, Bellevue Hospital New York, NY | 1971 – 1972 |
| Harlem Hospital Center | |
|   Assistant Visiting Physician | 1977 – 1981 |
|   Associate Attending Physician | 1981 – Present |
|   Physician-in-Charge, Coronary Care Unit | 1977 – Present |
|   Acting Chief, Division of Cardiology | 1993 – 1995 |
|   Chief, Division of Cardiology | 1996 – Present |

## HONORS

| | |
|---|---|
| Fellow, American College of Cardiology | 1988 |

Eric J. Vanderbush, M.D., F.A.C.C.
Curriculum Vitae
Page Three

## GRANTS

Co-principle investigator – Heart of Harlem, New York State
Department of Health, Mary Lasker Heart and Hypertension
Institute.

## DEPARTMENTAL AND UNIVERSITY COMMITTEES:

Chairman, Pharmacy and therapeutics

## OTHER:

| | |
|---|---|
| Clinician, Department of Health, Bureau of Tuberculosis, New York, NY | 1971 – 1972 |
| Screener, Health Insurance Plan, Emergency Service Program New York, NY | 1974 – 1975 |
| Medical Consultant, Pritikin Better Health Program New York, NY | 1980 – 1981 |
| Consultant, New York County Health Services Review Organization, New York, NY | 1979 – Present |
| Senior Consultant, Island Peer Review Organization Lake Success, New York | 1990 – 1993 |
| Consultant, Utilization Review, St. Clare's Hospital New York, NY | 1985 – 1997 |
| Consultant, Pacemaker Review, Cardiocare, Forest Hills, New York | 1982 – Present |
| Instructor, Advanced Life Support, New York Heart Association, Inc. New York, NY | 1982 – Present |
| Consultant, Bureau of Professional Medical Conduct New York State Health Department | 1987 – Present |
| Consultant, Blue Cross, New York City | 1993 – 1995 |
| Consultant, Health First, New York City | 1995 – Present |
| Consultant, Elder Plan, New York City | 2001 – Present |

## PUBLICATIONS:

Savage D, Brown J, Vanderbush E, Dickinson P:  Beta-hemolytic streptococcal endocarditis.
International Symposium on Streptococci and Streptococcal Diseases, 7th Chertney, England:
Redbooks,  1979:122-123.

Eric J. Vanderbush, M.D., F.A.C.C.
Curriculum Vitae
Page Four

## PUBLICATIONS: (cont.)

Kral MA, Spotnitz HM, Lee RG, King A, Vanderbush EJ, Brown J: Cardiac surgery in an inner-city population: Sixty-six consecutive cases. J Am Acad Phys. Assoc 1990, 3:291-294.

Brown J, McKinnon D, King A, Vanderbush E: Elevated arterial blood pressure in cardiac tamponade. N Engl J Med 1992; 397:463-466.

Sukernik MR, West O, Lawall O, Chittavelu B, Henderson R, Sherzoy A, Vanderbush EJ, Francis CK: Hemodynamic Correlates of Spontaneous Echo Contrast in the Descending Aorta. Am Journal Cardiol 1996; 77:184-186.

Sukernik MR, West O, Chittavelu B, Vanderbush EJ, Francis CK: Hemodynamic Predictors of Atherosclerosis in the Thoracic Aorta. Echocardiography, 1998; 15:157-161.

Vanderbush EJ: Six-second ECG Clinic. Quarterly Column. Pacing Dynamics. 2/3Q94(10-11), 1/2Q95(14-15), 3/4Q(5(14-15), 1Q96(12-13), 3/4Q96(14-15( 1Q97(14-15), 3Q97(13-15), 4Q97(14-15), 1Q98(10-11), 4Q98(17-19), 1/2Q99(14-16), 3/4Q99 (10-11).

Vanderbush E, Wong SL: Review of Cholesterol Management and the Impact of Interventions on Low-Density Lipoprotein Cholesterol (LDL-C) Goals As Defined by the National Cholesterol Education Program (NCEP). Proceeding of the 4th International Congress on Coronary Artery Disease, 2001 by Mondzzi Editore S.p.A. – MEDIMOND Inc., 357-361.

## ABSTRACTS:

Brown J, Brudney K, Vanderbush E, Pinckney C: Limited accuracy of the electrocardiogram in predicting left ventricular hypertrophy in the presence of left axis deviation. Clin Res 32:152A, 1984.

Schwartz W, Brown J, Dobkin J, Dickinson P, Dobsevage T, Price T, Vanderbush E: Accuracy of clinically diagnosed endocarditis in a high risk group with fever and bacteremia. Clinical Research 32:383A, 1984.

Edery T, Cumar C, Sugalsky J Jr, Vanderbush E: Pacemaker system analysis: A modified methodology to the standard approach to survival analysis. Presented at 7th Annual Scientific Session, North American Society of pacing and Electrophysiology, New Orleans, May, 1986.

Eric J. Vanderbush, M.D., F.A.C.C.
Curriculum Vitae
Page Five

## ABSTRACTS: (cont.)

Brown J, King A, Ellis C, Vanderbush E, Brudney K:  Diagnosis of left ventricular enlargement in patients with left anterior fascicular block. Presented at 13th International Congress on Electrocardiography, Washington, DC, September, 1986.

King A, Brown J, MacKinnon D, Vanderbush E, Francis CK:  Elevated blood pressure in cardiac tamponade.  Presented at the Fifth International Interdisciplinary Conference on Hypertension in Blacks, May 3-7, 1990.

Sukernik MR, Makhoul J, Vanderbush EJ, Abbasi A, Sherzoy A, Brown J:  Transesophgeal Echocardiography in Assessment of Pacemaker Associated Complications.  Presented at the World Congress of Echocardiography and Cardiovascular Ultrasound.  Nice, France  1994.

Sukernik MR, Makhoul J, Sherzoy A, Vanderbush EJ, Brown J: Spontaneous Echo Contrast in Descending Aorta.  What Does It Mean?  Presented at the World Congress of Echocardiography and Cardiovascular Ultrasound.  Nice, France  1994.

Sukernik MR, Makhoul J, Sherzoy A, Vanderbush EJ, et al: Spontaneous Echo Contrast in the Descending Aorta is Associated with Left Ventricular Dysfunction. Presented at the International World Congress on Heart Failure, Geneva, Switzerland 1994.

Onwuanyi A, Singal S, Lawal O, Sharif F, Cruz M, Hurley M, Vanderbush E, et al:  Electrocardiographic Criteria for Left Ventricular Hypertrophy in Black Population.  Presented at the American College of Cardiology, 44th Annual Scientific Session, March, 1995.

Babaev A, Rogoza AN, Kosmacheva ED, Vanderbush EJ, Atkov O:  Blood Pressure and heart Rate Variability, Left Ventricular Hypertrophy, Vascular Resistance in Patients with Essential Hypertension.  Presented at the Tenth Scientific Meeting of the American Society of Hypertension, New Orleans, Louisiana, May, 1995.

Sherzoy A, Matthews H, Sadler D, Brown J, Hodges D, Vanderbush EJ, Francis CK: Relationship Between Left Atrial Size and Echocardiographic Diastolic Filling Indices in Patients with Hypertension.  Biomedicine 1996, Washington, DC, May, 1996.

Babaev A, Bannister H, Vanderbush EJ, Poague V, Pickering T, Francis CK:  Circadian Viariation of Blood pressure and Lelft Ventricular Hypertrophy in Normotensive and Hypertensive Blacks.  Presented at the Sixteenth Scientific Meeting of The International Society of Hypertension, Glasgow, UK, June, 1996.

Eric J. Vanderbush, M.D., F.A.C.C.
Curriculum Vitae
Page Six

## ABSTRACTS:

Babaev A, Kosmacheva A, Rogoza A, Panfilov V, Atkov O, Vanderbush EJ, Francis CK: Arterial Baroreflex as a Predictor of Blood Pressure Response to Surgical Treatment of Renovascular Hypertension. Presented at the Sixteenth Scientific Meeting of The International Society of Hypertension, Glasgow, UK, June, 1996.

Akhter F, Onwuanyi A, Parris R, Henderson R, Vanderbush E, Francis C: Predictors of Length of Stay in Patients Hospitalized with Congestive Heart Failure: Experience at an Inner City Hospital. Presented at the 12th Scientific Meeting of The Interdisciplinary Conference on Hypertension in Blacks. London, England , July, 1997.

Akhter F, Babaev A, Suryadevara R, Vanderbush EJ, Francis CK: The Different Patterns of Cardiovascular Response to Tilt Table Testing in Hypertensive and Normotensive Patients with Syncope of Unknown Origin. Presented at The American College of Cardiology Scientific Meetings, Atlanta, GA, April, 1998.

Parris R, Onwuanyi A, Uthman A, Vanderbush E: Distribution of Left Ventricular Geometric Patterns in African-Americans. Presented at the Thirteenth International Interdisciplinary Conference on Hypertension in Blacks. July, 1998.

West O, Richard M, Sahni J, Raufi A, Akhter F, Vanderbush E: Angiographic Coronary Artery Disease Frequency in Inner City Hispanics Compared to African Americans. Presented at the Second International Congress on Coronary Artery Disease – From Prevention to Intervention, Florence, Italy. October, 1998.

Vanderbush E, Wong S: Review of Cholesterol Management and the Impact of Interventions on Low-Density Lipoprotein Cholesterol (LDL-C) Goals as Defined by the National Cholesterol Education Program (NCEP). Presented at the Fourth International Congress on Coronary Artery Disease, Prague, Czech Republic, October 2001.

## PRESENTATION AT PROFESSIONAL MEETINGS:

XV Jornadas Nacionales De La Sociedad Venezolana De Cardiologia Pergola Cruz, Venezuela, September 2-5, 1987.

First International Conference "Actual Problems of Cardiology", Institute Clinical and Preventive Cardiology, Russian Academy of Medical Sciences, Siberian Branch, Tyumen, Russia, November 22-23, 1994.

Eric J. Vanderbush, M.D., F.A.C.C.
Curriculum Vitae
Page Seven

Guest Lecturer: Use of Limited Echocardiography in Hypertensive Patients, Institute Clinical and Preventive Cardiology. Tyumen, Russia. November 26-27, 1996.

Guest Lecturer: Use of Antiplatelet Agents in Atherosclerotic Cardiovascular Disease and Cholesterol Management Guidelines, Experience in an inner-city Hospital. Second International Conference "Actual Problems of Cardiology", Institute Clinical and Preventive Cardiology, Russian Academy of medical Sciences, Siberian Branch, Tyumen, Russia. November 17-18, 1999.

Guest Lecturer: Current Management of Acute Coronary Syndrome 9th International Meeting "Cardiology Update 2002" Tyumen Cardology Center, Branch of the Institute of Cardiology, Tomsk Scientific Center, Tyumen, Russia. November 21-22, 2002.

01 03 03:03  FROM:                          TO:+212223134C                    PAGE:01

## CURRICULUM VITAE

Date prepared: 12/94

Name:              Mark J. Stern

Address:           210 Mimosa Drive, Roslyn, New York  11576

Place of Birth:    New York City

### Education:

| | |
|---|---|
| 1971 | Massachusetts Institute of Technology |
| 1975 M.D. | Mount Sinai School of Medicine |

### Postdoctoral Training:

#### Internships and Residencies:

| | |
|---|---|
| 1975-1976 | Intern in Medicine, Long Island Jewish-Hillside Medical Center, New Hyde Park, New York |
| 1976-1978 | Resident in Medicine, Long Island Jewish-Hillside Medical Center, New Hyde Park, New York |
| 1980-1981 | Chief Resident, Medicine, Long Island Jewish-Hillside Medical Center, New Hyde Park, New York |

#### Clinical and Research Fellowships:

| | |
|---|---|
| 1978-1980 | Cardiology Fellowship, Montefiore Hospital and Medical Center New Hyde Park, New York |

### Licensure and Certification:

| | |
|---|---|
| 1976 | Diplomate National Board of Medical Examiners |
| 1978 | American Board of Internal Medicine |
| 1981 | Cardiovascular Disease |

### Academic Appointments:

| | |
|---|---|
| 1984-1988 | Clinical Assistant Professor of Medicine, S.U.N.Y. Stonybrook |
| 1988-Present | Clinical Instructor in Medicine Cornell University |
| 1986-Present | Co-Chief Cardiology Little Neck Community Hospital |
| 1987-1991 | Medical Director Cardiocare |

## Hospital Appointments:

| | |
|---|---|
| 1981-1992 | Long Island Jewish Hospital Voluntary Attending |
| 1993-Present | Long Island Jewish Hospital Associate Attending Internal Medicine and Cardiology |
| 1986-Present | North Shore University Hospital Voluntary Staff |
| 1988-Present | North Shore Hospital-Asst. Attending |
| 1983-Present | Little Neck Community Hospital Cardiology Staff |
| 1986-1994 | Holliswood Hospital-Consulting Cardiology |
| 1992-Present | St. Francis Hospital-Adjunct Staff (Cardiology) |

## Memberships:

| | |
|---|---|
| 1978-Present | American Society of Internal Medicine |
| 1979-Present | American College of Physicians |
| 1980-Present | New York Cardiological Society |
| 1983-Present | Fellow of the American College of Cardiology |
| 1993-Present | Fellow of the American College of Physicians |

## Teaching Experience:

| | |
|---|---|
| 1986 | Current Concepts for the Primary Physician, Congestive Heart Failure, Little Neck Community Hospital |
| 1986 | Continuing Education for the Physician, Recent Developments - Treatment of Hypertension, Little Neck Community Hospital |
| 1988 | Basic Coronary Care Course, Review of Functional Dysrrhythmias, Ventricular Dys-rhythmias, Cardioversion, Defibrillation, Little Neck Community Hospital |
| 1989 | Update in Medicine for the Primary Care Physician Diagnosis and Care of the Acute M.I. Patient, Little Neck Community Hospital |
| 1989 | Continuing Education for the Physician, Ischemia and Muscle Death, Little Neck Community Hospital |
| 1990 | Continuing Education for the Primary Care Physician, Cholesterol and Coronary Artery Disease, Little Neck Community Hospital |
| 1992 | Continuing Education for the Primary Care Physician, Ventricular Arrhythmia, Little Neck Community Hospital |

<u>**Bibliography:**</u>

<u>**Journals**</u>

1. Mark J. Stern, Michael V. Cohen, Bernard Fish, Robert Rosenthal: Clinical Presentation and Non-Invasive Diagnosis of Right Heart Masses British Heart Journal 1981;46:552-8

2. Janet Lipski, Mark J. Stern, Robert Litwak, Simon Dack, Ephraim Donoso: Eight to Eleven Year Follow-up of 100 Patients with Fixed Rate Pacemakers [abstract] American Journal of Cardiology 1974;33-152

## <u>CERTIFICATION</u>

     I hereby certify that a copy of this Sentencing Memorandum was served via facsimile, e-mail and FedEx courier on October 21, 2005 upon:

     Maria Kahn, Esq.
     Assistant United States Attorney
     157 Church Street
     New Haven, CT 06510

                                 Michael J. Grudberg