UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE NO. 3:01CR264(AVC) |
| | : | |
| JOHN CANOVA | : | NOVEMBER 2, 2005 |

GOVERNMENT'S MEMORANDUM IN AID OF RESENTENCING

Introduction

The Government submits this memorandum in aid of the resentencing scheduled for November 10, 2005, and in response to defendant's sentencing letter dated October 21, 2005.

On April 7, 2004, after a jury had found the defendant guilty of a variety of substantive and conspiratorial crimes relating to his involvement in a multi-million dollar Medicare fraud, this Court sentenced the defendant to a one-year term of probation. The government appealed the sentence, and the defendant cross-appealed his conviction.

The Court of Appeals affirmed the defendant's conviction but vacated this Court's probationary sentence and remanded for resentencing. See United States v. Canova, 412 F.3d 331 (2d Cir. 2005). The Court of Appeals agreed with the government that this Court's conclusion that no loss resulted from the defendant's conduct was erroneous. Id. Indeed, the Court held that "the record supports an intended loss of recoupment in an amount of $5 million, and such a loss should have been factored into the Guidelines considered by the district court in imposing sentence." Id. at 355.

Accordingly, when a $5 million loss is factored into the Guidelines, the defendant's sentencing guidelines range on remand is 46 to 57 months imprisonment (total offense level 23).

See PSR at ¶¶ 42-51.  It is the government's position that, even if this Court grants a downward departure for public service or on any other ground, the Court should sentence the defendant to a period of incarceration and impose a punitive fine.  A sentence for an offense that the Second Circuit stated involved a "multi-million-dollar Medicare fraud" simply must include a period of incarceration to be a "reasonable" sentence under Booker v. United States, 125 S. Ct. 738 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  A sentence that provides for a period of incarceration is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as to provide general deterrance for those who would commit fraud on the government.  18 U.S.C. § 3533(a)(2)(A) & (B); see United States v. Godding, 405 F.3d 125, 127 (2d Cir. 2005) (*per curiam*) (post-Booker case vacating sentence of one day imprisonment, remanding, and noting concern "that the brevity of the term of imprisonment imposed . . . does not reflect the magnitude of the theft of nearly $366,000 over a five-year period").  Given the magnitude of the loss in this case, anything less than a sentence of incarceration and a serious fine would not in the government's view be a reasonable sentence and would not be consistent with the Court of Appeals' mandate in this case.

## Background

The factual background of this case is set forth in the Court of Appeals' decision and in the Pre-Sentence Report ("PSR"), ¶¶ 1-38.  See United States v. Canova, 412 F.3d 331, 335-343 (2d Cir. 2005).  The evidence admitted at trial, including the testimony of numerous persons at Raytel working directly under the defendant, established that the defendant engaged in a conspiracy to obstruct a federal audit and to defraud the United States, and made false statements to Medicare.  At sentencing, although the government argued that the Guidelines loss was

$5 million, this Court found no loss resulted from the fraud and instead relied on the alternative guideline calculation under § 2J1.2. The Court applied a two-level enhancement for role in the offense to a base offense level of 12, and then departed six levels based on defendant's public service and good works, resulting in a total offense level of 8. The Court sentenced the defendant to a one-year term of probation and a $1,000 fine. See Canova, 412 F.3d at 343.

The government appealed the sentence, arguing that a $5 million loss should have been factored into the Guidelines calculation. The Court of Appeals agreed. In vacating this Court's sentence, the Court of Appeals concluded that

> the record in this case did not permit [the district court] to conclude that the government sustained no loss from Canova's fraudulent schemes to substitute an abbreviated pacemaker test for the longer one required by Medicare specifications and to conceal that fraudulent substitution in order to prevent the government from exercising its right to recoupment. The record supports an intended loss of recoupment in an amount of $5 Million, and such a loss should have been factored into the Guidelines considered by the district court in imposing sentence.

Canova, 412 F.3d at 355. The Second Circuit remanded the case for resentencing, noting that "[b]ecause there is a significant difference between a Guidelines range calculated to include this loss and the Guidelines range relied upon by the district court, the error might well have affected the ultimate sentence, even though the district court applied a downward departure." Id. at 355-6.

In remanding this case, the Second Circuit was mindful of the district court's application of a downward departure as well as its authority to sentence under a "discretionary sentencing regime." Id. at 356. While the Court noted that after Booker not "every incorrectly calculated sentence will necessarily require a remand for sentencing," in this case, "[w]e conclude simply that 'the influence' of a $5-million error in the calculation of a fraud guideline has sufficient

potential to 'appreciabl[y] influence' the ultimate sentence even under the more discretionary post-*Booker* sentencing regime to warrant a remand with instructions to vacate Canova's sentence and to resentence him." Id. at 356.  In doing so, the Court of Appeals relied upon United States v. Elefant, 999 F.2d 674, 678 (2d Cir. 1993), which the Court noted had recognized that "[t]he degree of downward departure appropriate from one starting point will not necessarily be the same as is appropriate from a lower [or higher] starting point," and made note of United States v. Godding, 405 F.3d 125, 127 (2d Cir. 2005) (*per curiam*), in which the Court ordered a Crosby remand while noting concern that the sentence imposed by the district court did not reflect the magnitude of the offense.  See Canova, 412 F.3d at 356.

The Court of Appeals thus vacated the defendant's sentence and remanded for resentencing in accordance with United States v. Booker, 125 S. Ct. 738 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  See Canova, 412 F.3d at 359.

## Discussion

**I.    Sentencing Guidelines Calculation**

As set forth in the PSR, the sentencing guidelines calculations are as follows.  Using the guidelines effective November 1, 1998, the base offense level under U.S.S.G. § 2F1.1 is level 6. As the Court of Appeals held, the loss attributable to the defendant is $5,000,000, which increases the defendant's offense level by 13 levels, resulting in an offense level of 19.  Two levels are added for more than minimal planning under 2F1.1(b)(2)(A), and two levels are added for role in the offense under § 3B1.1, resulting in a total offense level of 23.  Thus, the defendant's total offense level is 23, resulting in a guideline range of 46 to 57 months'

imprisonment and a fine of $ 10,000 to $ 100,000.  With an offense level of 23 and a criminal history category of I, the defendant's sentencing guidelines range is 46 to 57 months.

The government understands that at the original sentencing this Court granted the defendant a six-level departure based on public service, and that the Court of Appeals noted that the court could reconsider that decision in light of the defendant's higher guideline range at resentencing on remand.  See Canova, 412 F.3d at 359 n.29.  However, it is the government's position that, notwithstanding any such departure on remand, the extent of such a departure must be reasonable, and that the court's ultimate sentence should provide for a period of incarceration.  A sentence that does not include a period of incarceration will continue, as the Court of Appeals stated, "to raise a question as to the reasonableness of the sentence imposed."  Id. at 359; see Godding, 405 F.3d at 127.

## II.    The Loss Does Not Overstate the Seriousness of the Offense

The defendant claims that the loss as found by the Second Circuit overstates the seriousness of the offense because technicians only short cut the third portion of the test which according to certain cardiologists was not necessary for diagnostic purposes.[1]  The evidence,

---

[1] The defendant's own statements and assurances in his letter to Medicare, dated January 27, 2000, disprove his claim that complete tests are not necessary for diagnostic purposes and that the incomplete tests therefore resulted in no loss to the Government.  Likewise, his claims that new pacemaker technology eliminates the risk of pacemaker malfunction and the need for the last portion of the test also lacks merit.  Apart from legitimate medical reasons for that portion of the test, the test reports in evidence indicate that the pacemaker devices implanted in many patients were older devices.  For example, the tests attached to one of the Medicare Audit requests, Gov. Tr. Ex. 5, relating to Patient Margaret Stutz, reveal that the tests related to a device implanted in 1985 and subsequently replaced in 1998.  Thus, the claim that new technology eliminates the technicians need to perform the demand after magnet portion of the test is of little value to patients whose device is substantially older.

however, established that Raytel technicians routinely failed to comply with all three portions of the test.

In an effort to increase production and Medicare reimbursement, technicians conducted less than 30 seconds of ECG during all three phases of the test, demand, magnet and demand after magnet. At trial, the Government introduce evidence of random statistical samples performed on the tests available during relevant time periods. Gov. Tr. Ex. 60-62. The Government's random statistical samples conducted by audit staff and introduced at trial revealed that the non-compliance rate was between sixty five plus percent (65.3%) and seventy eight percent (78%). See Canova, 412 F.3d at 337. The defendant testified at trial about a random sampling of approximately 75 tests performed in New York and introduced an exhibit outlining his findings. Def. Tr. Ex. 21. According to the defendant's own chart, of the 75 New York tests he reviewed, only 18, or 25.71%, of those tests were compliant, meaning had 28/28/28 seconds of EKG strip or a complete test was otherwise contraindicated. Def. Tr. Ex. 21 at 2; Tr. at 1030.

The evidence of non-compliance was so conclusive that even the defendant did not dispute that Raytel technicians were cutting short all three portions of the test. Rather, his defense focused on his lack of knowledge of the technicians practices – a defense the evidence did not support and the jury did not believe. Thus, to argue at sentencing that loss should be reduced because Connecticut technicians' only shortcut was not recording the DAM (the last 30 second portion of the test), is disingenuous. The potential risk that the abbreviated tests posed to patients not only establishes the seriousness of the offense but justifies the loss determined by the Second Circuit. See U.S. v. Khan, 53 F.3d 507, 518 (2d Cir. 1995) (upward adjustment upheld

in a health care fraud case involving a loss of over $1 million, where the "scheme created a substantial risk to patients . . . because the clinics administered medical exams and dispensed prescription drugs without regard to the patients' needs").

Even assuming *arguendo* that the fraud concerned only the last portion of the test, the loss of $5 million still does not overstate the seriousness of the offense. Recognizing that the Court of Appeal's decision focused not on the actual loss to Medicare but on the defendant's intent to frustrate Medicare's efforts to recoup payment for non-compliant tests, Canova, 412 F.3d at 355, defendant claims that such a recoupment would have been unfair since Medicare should not collect the value of the full test simply because the technicians failed to record the last portion of the test. But the Court of Appeals has already covered that ground. Simply put, Medicare was entitled to recover the full value of the tests that were not performed in accordance with their guidelines, regardless of how much of the test was actually performed. Canova, 412 F.3d at 354-5. The fact that Medicare received a portion of the test does not warrant a finding that the loss overstates the offense.

Defendant's own testimony during the trial established that he was well aware of Medicare's right to recover full payment for all the shorted tests. As the defendant admitted at trial, he knew that the financial consequences of a failed audit would be devastating to the company. At trial, the defendant, in explaining one of his e-mails, testified:

> As I previously stated, the original claim rejections were for 13 months prior to the date of the claim rejection, and my concern . . . was <u>if Medicare required any tests that was a full disclosure greater than six months old, Raytel could not provide that information. I processed in Connecticut about 15, 20,000 tests a month. That's a large bullet to take as a financial hit.</u>

7

Tr. at 985-986 (emphasis added); Gov. Tr. Ex. 44. The Second Circuit quoted Canova's testimony on this point, and noted that "Canova's trial testimony made plain that he understood what was at stake." Canova, 412 F.3d at 355.

The defendant's acknowledgment that corporate liability and resulting loss to Medicare was significant is further documented in the e-mail he sent to his lower-level supervisors specifically instructing them how to handle Medicare's on-site visit and exactly what representations to make regarding the company's performance of the test. Gov. Tr. Ex. 41; Tr. at 978. The defendant concludes that e-mail by reminding his staff that "[e]veryone should understand the critical nature of this visit. A successful visit will not only eliminate any doubts in Raytel's compliance procedures and speed up claims processing, but will help speed up the process in the ICD program." Gov. Tr. Ex. 41. In light of his own admissions about the importance of the audit and the need to satisfy Medicare that Raytel was performing complete tests, defendant's claim that a $5 Million loss recovery by Medicare would be unfair is baseless.

Moreover, Raytel paid $11.5 Million to the Government, of which $5 Million was used to reimburse Medicare for damages. The punitive sanction that the defendant refers to was the additional $6.5 Million the company paid in double damages. See Canova, 412 F.3d at 355 ("This loss amount [of $5 million] finds support not only in the cited trial evidence, but in Raytel's own acceptance of a $5-million restitution order as part of the plea agreement in its criminal case.").

Nor is the defendant entitled to a finding of lesser culpability. As the Court of Appeals correctly noted, it was under his direction and pressure from "Canova's performance quotas," that Raytel employees routinely performed shorter tests. Canova, 412 F.3d at 337. Further,

when Medicare learned of these non-compliant practices from an anonymous tip, it was the defendant that assumed responsibility for responding to Medicare's audit and directed certain employees to alter records. More importantly, as the jury concluded, it was the defendant that repeatedly lied to Medicare to cover up the non-compliance.[2] In fact, but for defendant's obstruction, Medicare[3] would have initiated recoupment proceedings. See U.S. v. Arutunoff, 1

---

[2] As the documentary evidence admitted at trial establishes, the defendant repeatedly sought to assure Medicare officials that Raytel was in fact performing all three portions of the test in full. For example, in a letter to Medicare after an on-site visit the defendant states:

> To address your concerns regarding Raytel obtaining 90 seconds of ECG readings, we demonstrated that process in three different phases of our operation . . . The procedure [demonstrated to Medicare] included the taking of a 30-second free running strip, a 30-second magnet strip and another 30-second free running strip. We demonstrated the way in which the technician reviews the full 90 seconds on the strips and selects 7 ½ second representative strips of the both free running and the magnet recordings . . . Our internal quality analyst reviews the printed report which contains the representative strips selected by the technician as well as the entire recording that is stored in our database . . . Throughout this process, Raytel has demonstrated that it is our standard operating procedure to obtain the full 90 seconds of ECG required by HCFA [Medicare] as outlined in Publication 06, Section 50-1 . . . While Raytel only forwards the representative 15 seconds of EKG, the additional 30 seconds of recording provide us with additional strips we feel necessary to properly evaluate this specific type of unit. Finally, in the case of any reading that is symptomatic or requires immediate attention, Raytel does provide the referring physician with additional strips beyond the normal 15 seconds.

Gov. Tr. Ex. 11. These assurances that complete tests were not only important but actually performed and retained by Raytel were repeated by the defendant and others under his direction to Medicare in an effort to prevent Medicare from learning the truth and recovering the ultimate overpayment of claims.

[3] Defendant relies on this Court's reference to trial testimony relating to an inquiry to Medicare by a Raytel employee where the Medicare representative was unfamiliar with Medicare's policy regarding transtelephonic pacemaker testing. This claim makes no sense. First, the fact that a single employee when called without prior notice could not respond to a question, does not obsolve the defendant or the company of a duty to comply with that policy. More importantly, however, there is no question in this case that the defendant knew what Medicare required. In fact, he repeatedly reassured Medicare that Raytel was in compliance. Thus, reliance on this claim as a basis for a reduced sentence is absurd.

F.3d 1112, 1120 (10th Cir. 1993) (10 level departure for a defendant, who did not play leading role, unreasonable); see also U.S. v. Maldonado-Montalvo, 356 F.3d 65, 73 (1st Cir. 2003) (rejecting downward departure based on claim that victim's employees acquiesced in the conduct and others in the industry engaged in the same conduct). This is hardly the role of a lesser culpable defendant.[4]

The evidence established that the defendant directed the fraudulent activity at the heart of this case, and that he attempted to orchestrate a cover-up by lying to Medicare and law enforcement agents. Health care fraud is a serious offense that affects the national economy and the benefits of thousands of elderly and sick people that would otherwise not have access to health care. See United States v. Thurston, 358 F.3d 51, 81 ("Health care fraud is a serious crime and the federal interest in combating it is powerful."). It is a system that must rely on the honesty of providers, such as Raytel, in submitting legitimate claims for reimbursement. When a corporate officer like the defendant is involved in submitting claims to the government for reimbursement under false pretenses, and then conceals the scheme during a government audit, the integrity of our national health care system is compromised and "the public's confidence in government" is undermined as a result. See Khan, 53 F.3d at 518.

---

[4] Should this Court opt to depart on the basis that the loss overstates the seriousness of the offense, the Court's departure must be reasonable. See U.S. v. Arutunoff, 1 F.3d 1112, 1120 (10th Cir. 1993). In Arutunoff, the Court held that a departure of 10 levels from an offense level of 20 was unreasonable because it reduced the loss caused by defendant to 2 levels or a loss range of $5,000 to $10,000. Id. The original loss was calculated at $1,500,000, of which defendant benefitted $110,000. Id. Likewise, a departure to a level that results in no incarceration would be unreasonable given the original loss amount and the defendant's role in this serious offense.

It is worth noting that other Courts of Appeals have upheld high loss calculations in cases involving Medicare and Medicaid fraud.  See United States v. Braxtonbrown-Smith, 278 F.3d 1348 (D.C.Cir.2002)(60 month sentence imposed in health care fraud case where loss exceeded $2 million); United States v. Liss, 265 F.3d 1220 (11th Cir.2001) (upheld 15 month sentence in health care fraud case involving payment of $29,000 in kickbacks for referrals of legitimate tests); United States v. Regueiro, 240 F.3d 1321 (11th Cir.2001) (upheld 144 month sentence in health care fraud involving a loss exceeding $15 million); United States v. McClendon, 195 F.3d 598 (11th Cir.1999) (78 month sentence affirmed in health care fraud case where loss to Medicare exceeded $3 million); see also  U.S. v. Mohammed, 315 F. Supp.2d 354, 358 (S.D.N.Y. 2003)(upholding higher loss value in credit card fraud case noting impact of this crime on the economy).  The defendant's fraudulent conduct should be addressed through just punishment, and that punishment should include a term of incarceration that reflects the seriousness of the offense and promotes respect for the law.  See Godding, 405 F.3d at 127.

**Conclusion**

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a period of incarceration and impose a punitive fine.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


By:   JAMES G. GENCO
      ASSISTANT UNITED STATES ATTORNEY
      Federal Bar No. Ct00360

For:  ERIC J. GLOVER
      ASSISTANT UNITED STATES ATTORNEY
      Federal Bar No. Ct
      157 Church Street
      New Haven, Connecticut 06510
      (203) 821-3700
      Fax: (203) 821-3745
      eric.glover@usdoj.gov


      MARIA A. KAHN
      ASSISTANT UNITED STATES ATTORNEY
      Federal Bar No. Ct06573
      157 Church Street
      New Haven, Connecticut 06510
      (203) 821-3700

CERTIFICATION OF SERVICE

  This is to certify that the within and foregoing has been sent by email and first class mail, postage prepaid, this 2nd the day of November, 2005 to:

Paul Shechtman, Esq.
Michael J. Grudberg, Esq.
Stillman & Friedman, P.C.
425 Park Avenue
New York, N.Y. 10022
pshechtman@stillmanfriedman.com
Mgrudberg@stillmanfriedman.com

Raymond Lopez
Senior U.S. Probation Office
915 Lafayette Blvd.
Bridgeport, CT 06604

          By: _____
             JAMES G. GENCO
             ASSISTANT UNITED STATES ATTORNEY
         For: ERIC J. GLOVER
             ASSISTANT UNITED STATES ATTORNEY