UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | 3:01 CR 264 (AVC) |
| v. | | |
| | : | NOVEMBER 7, 2005 |
| JOHN CANOVA | | |
| | : | |

**REPLY MEMORANDUM OF JOHN CANOVA**

This memorandum is respectfully submitted in response to the government's Sentencing Memorandum in the above-captioned case.

1.  As it did at the initial sentencing, the government argues that the "abbreviated tests" posed a "potential risk" to Raytel's patients. Gov't Mem. at 5-6. This claim is unworthy of the government. In the four year history of this case, the government has never proffered a single letter from a cardiologist (or cited to a medical treatise) to support the suggestion that Raytel patients were exposed to risk if the demand after magnet phase was not run in the computer. Nor has it identified a single example of pacemaker malfunction that occurred as a result of Raytel's testing procedures. And, once again, it has failed to explain why the risk of malfunction supposedly existed for Raytel patients but does not exist for Veterans Administration patients, for whom no post-magnet testing is conducted. The truth is that "no patient has been or could have been harmed or placed at risk by [Raytel's] telephonic pacemaker analysis or reporting." Letter of Dr. S.J. Schneller. Potential harm to patients is therefore as

much a canard in November 2005, as it was in April 2003, when Mr. Canova was first sentenced.[1]

2.   In arguing that there was a potential risk to patients that "establishes the seriousness of [Mr. Canova's] offense," the government cites to United States v. Khan, 53 F.3d 507 (2d Cir. 1995). Gov't Mem. at 6. The citation is wildly off the mark. The defendant in Khan ran clinics which "administered medical exams and dispensed prescription drugs without regard to patients' needs," resulting in "uniformly poor medical treatment to a population [indigent drug addicts] that sorely needed treatment." Id. at 518. Raytel, by contrast, provided uniformly high quality trans-telephonic testing that enabled cardiologists accurately to determine the reliability of its patients' pacemakers. The government's unwillingness to acknowledge that Mr. Canova is not situated similarly to Mr. Khan – i.e., that there was no harm to patients here – remains the most perplexing aspect of this case.

3.   The government argues that Raytel's technicians "conducted less than 30 seconds of ECG during all three phases of the test." Gov't Mem. at 6 (emphasis added). The short answer is that there was no proof that the Connecticut technicians purposefully abbreviated the first two phases of the test or that Mr. Canova countenanced such conduct. To bolster its position, the government points to a defense exhibit (D. Ex. 21) showing a random sample of

---

[1]   As it did in 2003, the government cites Margaret Stutz as an example of a patient with an "older" pacemaker who was supposedly in jeopardy if the DAM phase was not completed. Gov't Mem. at 5 n.1. In 2003, we observed

> [Ms Stutz's] original Intermedics 253-19 pacemaker, implanted in 1985, . . . has a "lithium iodine cell" for a battery. All such devices feature electronic circuit switching, and none has a reed switch [which might become stuck in the magnet mode]. Should the Court wish, Jason Sholder, who holds dozens of patents in pacemaker design, will confirm these facts at sentencing.

Defendant's Reply Memorandum 4/3/03 at n.1. For the government, once again, to point to Ms. Stutz shows the emptiness of its patient harm claim.

New York tests, which it claims reveals that "only 25.71% of . . . tests were compliant" Id. That is untrue. As the Court will recall, there was testimony that Raytel technicians would record the DAM phase in the demand field for ease in selecting a representative strip. When such tests are counted, the full compliance percentage increases to 40 percent. Moreover, the vast majority of tests performed in New York had significant (20 to 30 seconds) of ECG in all three phases. See D. Ex. 21 attached hereto as Ex. A. The reality is that 30-30-30 testing depends upon an often elderly patient's counting aloud to 30 as the technician conducts the test. That some patients counted quickly (and, as the chart shows, others counted slowly) hardly suggests that there was fraud.

    4.    At the initial sentencing, the Court observed that among the factors it was considering was the "disturbing evidence that was offered in the case, specifically . . . an inquiry to Medicare representatives that Medicare itself couldn't tell from the language of its own policy that the demand after magnet phase of this so-called 30-30-30 test was required." Tr. 4/4/03 at 27. Remarkably, the government writes that the Court's "claim makes no sense." Gov't Mem. at 9 n.3; id. ("reliance on this claim as a basis for a reduced sentence is absurd"). We respectfully submit that the Court's observation was sound. At trial, Steve Boecklin, a Raytel supervisor, testified that he had twice called Medicare to determine whether it was necessary to run the demand after magnet phase in the computer. Each time, he spoke with a "senior" Medicare employee, and each time he was told "Geez, I don't know what that [regulation] means." Tr. 557. According to Mr. Boecklin, he and Ron Vincent then decided to inform the Connecticut technicians that they did not have to record the last 30 seconds of the test in the computer. Id. at 558 ("we always did the test, we just didn't run it in the computer"). When the

genesis of a crime is a supervisor's good faith effort to interpret a guideline that Medicare itself could not interpret, it hardly seems "absurd" to consider that fact in fashioning a fair sentence.

5.  Viewed in the light most favorable to the government (and consistent with the Second Circuit's opinion), John Canova's crime was to make false representations to prevent Medicare from recouping the full payment that Raytel had received for pacemaker testing not performed according to Medicare specifications. On this record, however, for Medicare to have required full reimbursement would have been a draconian sanction.[2] To the extent some Raytel technicians cut corners, it was only by not recording the final 30 seconds (the DAM phase) in the computer.  Otherwise, the full test was conducted – "the patient[s were] counting to 30, the information was coming in, the techn[icians] could hear it" (Tr. 558) -- and indeed it was recorded in a voice log from which it could have been retrieved if necessary.  Thus, the misrepresentations for which Mr. Canova was convicted arose out of an understandable fear that Medicare would unfairly insist on full recoupment and thereby bankrupt the company.  Surely, such conduct is a far cry from the typical health care fraud.

6.  Perhaps not surprisingly, the government has failed to address the hypothetical that we posited in our opening memorandum.  It bears brief repetition: A submits a claim for $10,000 in travel expenses of which $100 is false.  Government regulations say that any falsity is grounds for denial of the entire claim.  A then lies to an investigator about the $100 false invoice to avoid the draconian recoupment remedy.  Would anyone judge A the same as a person who had submitted $10,000 in false claims and lied to protect himself?  That is what the

---

[2]   In its memorandum, the government writes that "Raytel paid $11.5 Million to the Government, of which $5 Million was used to reimburse Medicare for damages [and the remainder was] the punitive sanction." Gov't Mem. at 8.  Our point is simply that a recoupment regulation that gives no value for the services provided is itself punitive. As such, it provides a poor basis for assessing a defendant's true culpability.

government asks this Court to do, and neither the guidelines nor Booker, we submit, compel such a result.

7.  The government cites several cases in which Courts of Appeals have upheld firm sentences in cases involving Medicare and Medicaid fraud. Gov't Mem. at 11. None of these cases, however, is remotely similar to this one. See United States v. Braxtonbrown-Smith, 278 F.3d 1348 (D.C. Cir. 2002)(defendant billed Medicaid for psychiatrist services "despite the fact that the clinic was not yet operational and many of [the] clients were non-communicative and could not speak"); United States v. McClendon, 195 F.3d 598 (11th Cir. 1999)(defendant billed Medicaid for psychotherapy services "few, if any, of which [the enrolled] children actually received"). United States v. Regueiro, 240 F.3d 1321 (11th Cir. 2001) (defendants "used the nursing groups to bill Medicare for thousands of services that were never performed, or that were performed on patients who were not eligible to receive Medicare benefits"). What occurred in these cases -- billing for phantom services or patients -- is light years from the conduct here. If anything, these cases support our conclusion that this is not a heartland fraud.[3]

8.  What seems not in dispute is that John Canova has led an otherwise estimable life. As the letters to the Court unmistakably demonstrate, he is a loving husband and father, a caring co-worker, and an outstanding citizen. See letter of Rabbi Alan B. Lucas ("[t]here is no one whom I know to whom family is more important than John Canova").[4] Since the initial sentencing in April 2003, he has proven that the Court's confidence in him was well

---

[3] United States v. Godding, 405 F.3d 125 (2d Cir. 2005), which the government repeatedly cites, is also distinguishable. There the defendant embezzled $366,000 from her employer, a federally insured bank, over a five-year period. It is therefore understandable that the Court expressed concern that a non-incarcerative sentence might be unreasonable.

[4] A letter from Rabbi Lucas is included in as Ex. B.

placed. It is not hyperbole to suggest that few people have appeared before this Court for sentencing who are as fundamentally decent as John Canova. For all these reasons, we respectfully submit that a sentence of imprisonment is unwarranted in this case.

    Respectfully submitted,

    STILLMAN & FRIEDMAN, P.C.

    By: _/s/_____
    Paul Shechtman (CT23320)
    Michael J. Grudberg (CT23165)

    Attorneys for Defendant
    425 Park Avenue
    New York, New York 10022
    (212) 223-0200 (tel.)
    (212) 223-1942 (fax)
    Pshechtman@stillmanfriedman.com
    Mgrudberg@stillmanfriedman.com

## **CERTIFICATION**

      I hereby certify that a copy of this Reply Memorandum was served via facsimile, e-mail and FedEx courier on November 7, 2005 upon:

    Maria Kahn, Esq.
    Eric Glover, Esq.
    James Genco, Esq.
    Assistant United States Attorneys
    157 Church Street
    New Haven, CT 06510

                                                      Michael J. Grudberg